[No. 7648.]

The People ex rel. v. Scott et al.

1. Constitutional Law—*Title of Staute*—The act establishing the court of appeals (Laws 1911, c. 107) contains but one subject which is clearly expressed in the title "An Act in relation to courts of review"—(65).

2. ——*Vacancies in Office—Appointments by Governor*—The provisions of sec. 6, art. 4, of the constitution, that "if during the recess of the senate a vacancy occurs" in any office, as to which no other provision is made "the governor shall appoint some fit person to discharge the duties thereof until the next meeting of the senate," refers to cases where the joint action of the governor and the senate is necessary to fill a vacancy. An *ad interim* appointment by the governor during the recess of the senate, does not fill a vacancy in the office.

This is accomplished when, under the concluding provisions of the section, the senate being assembled, the governor nominates, and the senate confirms the nomination—(76-78).

3. Statutes—*Construction*—The history of an enactment and the evils, inconveniences, or adverse conditions sought to be relieved thereby, are to be taken into consideration in ascertaining the meaning of particular provisions—(86).

4. ——*Waiver of Statutory Right*—Generally speaking, one may waive any right given by statute. The right to the determination of a particular cause in a particular court is not within any exception to this general rule—(69, 70).

5. STATUTES—*Construed*—The provisions of the statute establishing the court of appeals that certain causes shall be transferred by the supreme court to that court in no way impairs the jurisdiction of the supreme court—(66).

The jurisdiction of a court does not depend upon the number of cases disposed of therein. Nothing in the act in question impairs the dignity or standing of the supreme court. The court of appeals, as well as all other courts, remains subordinate to it, and it has no co-ordinate. The act establishing the court of appeals has not the effect to discontinue pending appeals, but only to transfer them to the new court. Neither does it deprive any suitor of the writ of error out of the supreme court, nor deprive any one of the right to have such writ of error determined in the supreme court, but gives the choice of an additional tribunal in which the writ of error may be heard—(68, 69).

It is not the election of the party, under section 5 of the act, which confers jurisdiction on the court of appeals. Jurisdiction is conferred by the act itself. When the party, after due notice, fails to petition for a remand of the cause, he, by this omission confers jurisdiction of his person, and the particular cause, upon the court of appeals, and that court having such jurisdiction its judgment is binding. The finality of the judgment is not affected by the statute, but by the party's own choice —(69).

The provision of the statute (sec. 1) that appointments to the office of judges of the court "shall not take effect until a confirmation thereof by the senate," refers to original appointments for the full term. And the senate having adjourned before the act took effect, a vacancy was then existing in the office of the judges of the court, and no provision being made by the statute for filling the vacancy until the meeting of the senate, it became at once the duty of the governor, under the provisions of the constitution, to appoint some fit persons to discharge the duties of the office, until the next meeting of the senate—(78).

The persons so appointed were lawfully appointed and lawfully entered upon the duties of the office, and there is no authority anywhere to oust them, until the senate again convenes—(81).

The confirmation of these appointments to fill the office of the judges of the court at an extraodinary session of the senate

was not contemplated by the act. (1) Because as shown by the provisions of the statute it was the purpose of the general assembly that it should go into immediate operation, in order that the congested condition of the docket of the supreme court might be relieved; and the calling of an extraordinary session of the senate was an event too remote, uncertain, and conjectural, to be selected by any reasonable person for the initiation of the work of the new court. (2) Because the act indicates that confirmation of the appointments made thereunder were intended to be made at regular sessions of the general assembly. (3) Because it is to be presumed that the general assembly were aware of the doctrine announced in the *People v. Rucker*, 5 Colo. 455, and intended to be controlled by it. So intending they could not have contemplated an extra session—(82).

The provision of sec. 1 of the statute that, "except in case of vacancy through death, resignation or removal from office the governor shall fill the same until the next session of the legislature when the senate may confirm or reject the appointment so made," though in form an exception, is in effect an independent clause. Everything embraced within an exception must be included in that from which it is excepted—(79).

6. Appeal—*A Statutory Remedy*—An appeal is a statutory remedy. The right to appeal, being given by a statute, may be taken away by statute—(67).

## Original Proceeding in Quo Warranto.

Hon. Benjamin Griffith, attorney general, Mr. Mr. John T. Barnett, Mr. Caldwell Yeaman, Mr. James W. McCreery, Mr. N. C. Miller and Mr. Jesse G. Northcutt for relators.

M. T. J. O'Donnell, Mr. Jas. J. Banks, Mr. Charles S. Thomas, Mr. Edwin Van Cise, Mr. Joseph C. Helm, Mr. N. Walter Dixon and Mr. Henry McAllister, Jr. for respondents.

*Petition Dismissed.*

Mr. Justice Musser delivered the opinion of the court:

.The eighteenth general assembly passed an act entitled, "An act in relation to courts of review." The first section establishes a court to be known as the "court of appeals," which shall exist for a period of four years from the date upon which the act took effect, and provides for the number, qualifications, compensation and appointment of the judges, the filling of vacancies and the terms of the court. The second section provides for clerks of the court, stenographers to the judges, and other things immaterial here. Section 3 fixes the jurisdiction of the new court and says that it "shall have jurisdiction to review and determine all judgments in civil causes now pending upon the docket of the supreme court, or wherein appeals were perfected prior to the taking effect of this act, or that may hereafter and during the life of the court of appeals be taken to the supreme court for review, save and except writs of error to county courts." Section 4 provides that the statutes granting and regulating appeals from the district and county courts to the supreme court be repealed; that the jurisdiction of the latter court on appeal, even as to causes already pending therein, shall, save as in section 6 provided, terminate upon the taking effect of the act, except for the purpose of entering the order of transfer to the new court; that such repeal shall not operate as a dismissal of pending appeals, or of appeals perfected, and not yet docketed, but that all such appeals shall, immediately upon the organization of the new court, or thereafter, and upon the docketing thereof, be transferred from the supreme court to the new court for hearing and determination, and that the decision of the court of appeals in all such cases shall be final and conclusive, except as to those specified in section 6 of the act, and substitutes error for appeal in certain causes. The other provisions of section 4 are not material here. Section 5 au-

thorizes the supreme court to transfer such other civil causes now or hereafter and during the life of the new court, pending before the supreme court on error, as the latter court may deem advisable, omitting, however, writs of error to county courts. Section 5 then provides as follows:

"And immediately upon such assignment and transfer of causes so pending on error, the clerk of the court of appeals, shall, by registered mail, notify the parties to each of said causes or their attorneys of record, of such transfer, and advise them that unless within thirty days from the date of said notice a petition be filed requesting that the same be remanded to the supreme court, a waiver by consent will be conclusively presumed of the right or privilege, if any such right or privilege exists, to a hearing and determination of the writ of error by the supreme court. And if either of the parties or his attorneys, to a cause thus removed, shall, within the time above specified, file such petition to remand, the same shall be at once returned to the supreme court docket for final consideration and decision. But in all cases pending on error thus transferred, wherein no such petition be filed within the 30 days mentioned in the notice, the decision of the court of appeals shall, with the exceptions specified in section 6 of the act, be final and conclusive."

Section 6 is as follows:

"Provided, however, that in causes thus transferred from the supreme court to the court of appeals, whether pending on appeal or error, wherein the decision necessarily involves the construction of a provision of the federal or state constitution, or relates to a franchise or freehold, or a judgment for more than $5,000, exclusive of costs, such decision thereof by the court of appeals shall not be final. Such cases may be reheard in the supreme

court by writ of error from the latter court, under rules to be adopted by it. Or if, before a hearing in any case, either party thereto shall advise the court of appeals that it belongs to one of the classes of cases in this section above specified, and the court shall upon investigation so find, it shall at once and without further proceedings remand the same to the supreme court for determination."

Section 7, among other things, provides that the court shall have power to adopt rules regulating the procedure therein, that it shall be a court of record having a seal and that it shall have power to issue all necessary and proper writs and processes in aid of its jurisdiction, "in the same manner and with the same effect as the supreme court." The balance of the act provides for detail matters, which need not be noticed. After the act went into effect the respondents by appointment by the governor, organized the new court of appeals and entered upon the discharge of the duties of judges thereof, and this original proceeding in *quo warranto* was brought to test the right of respondents to do so. Two questions are presented for determination. First, is the act constitutional? Second, were the appointments of respondents valid?

The court created by this act is a court of review, and its jurisdiction extends only to such civil causes as may be transferred to it from the supreme court. Section 1 of article VI of the constitution declares that, "The judicial power of the state as to matters of law and equity, except as in the constitution otherwise provided, shall be vested in a supreme court, district courts, county courts, justices of the peace, and such other courts as may be provided by law." By this section, the general assembly is authorized to create a court of review, and as there is no express constitutional limitation of the jurisdiction that may be conferred upon such a court thus created, if

the act is unconstitutional it must be because the jurisdiction sought to be conferred is by implication prohibited in some degree by other constitutional provisions.—*People. v. Richmond,* 16 Colo. 274.

Every question, save one, raised by relators, that is within the facts of this case, and which must be considered in order to determine it, was answered by this court in the case of *People v. Richmond, supra,* and there resolved against the contention of these relators. If any such question was not directly answered in that case, it is answered by the conclusions which must necessarily follow from the reasoning therein, and the answer is at once apparent upon the reading of the decision. The one such question raised now, that was not raised in the Richmond case, relates to the sufficiency of the title of the act. It is claimed that the title of the present act is obnoxious to section 21 of article V of the constitution, which provides:

"No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed."

There is nothing in the present act but what relates to courts of review, so that the act contains but one subject clearly expressed in its title. This is settled in the case of *Golden Canal Co. v. Bright,* 8 Colo. 144, where the subject is thoroughly discussed. In speaking of this constitutional provision, relating to the title of a bill, this court said:

"This constitutional inhibition must receive a reasonable construction. It is enough if the bill treats of but one general subject and that subject is expressed in the

title; to require that each subdivision of the subject, each and every of the 'ends and means necessary or convenient for the accomplishment of the object,' must be specifically mentioned in the title, would greatly impede and embarrass legitimate legislation. Judge Cooley asserts that it would 'actually render legislation impossible.' "

Any other questions than such as are above described are not pertinent to this case, and their discussion would be *obiter*. Relators contend that the general assembly cannot take away from the supreme court any of the jurisdiction conferred upon it by the constitution. This abstract proposition cannot be denied. In discussing the question, however, as applicable to the present act, they constantly confuse the constitutional jurisdiction of the supreme court with the quantity of business that may be transacted by it. The jurisdiction of a court is one thing, the amount of business it may transact is another. A court may, in one year, dispose of a great number of cases, and in the next year dispose of but half as many, yet its jurisdiction, during the second year, would be the same as during the first. A court may dispose of a certain number of cases during a certain time, and another court of like jurisdiction may dispose of one-half as many cases in the same time, yet it cannot be said that the jurisdiction of the latter court was lessened any on that account. This act does not, in any way, impair the constitutional jurisdiction of this court. If it did, that question would be in this case. All the act does is to reasonably regulate the quantity of business before this court for a limited period. The constitution confers and defines the jurisdiction of this court, but it does not "forbid the legislature from regulating, to some extent the quantity of its business by reasonably contracting or enlarging the limits of the exercise of such jurisdiction as the exigencies

of the public welfare may require.  An extensive legis-
lative power to regulate the exercise of judicial authority
is an imperative necessity.   A constitutional provision,
unalterably defining and fixing in all respects such juris-
diction, would be a serious misfortune.   The constitutional
policy seems to have been, not to specify absolutely the
extent and boundaries of the jurisdiction of all the courts,
but to allow a large legislative discretion, so that the
varying demands and the ever-changing necessities of
the people may from time to time be adequately provided
for."—*People v. Richmond, supra.*

The present act abolishes the right of appeal and pro-
vides that appeals, pending in the supreme court, should
be transferred to and determined by the other, and re-
quires no notice of the transfer of such appeals, or any
objection to be made to such transfer.   In this respect,
the act differs from the one under consideration in the
Richmond case.   In that case it was said that appeals
are creatures of statute.   Indeed, this is so well established
that it cannot be refuted.   A statutory right of this kind
may be taken away by statute.   In *Callahan v. Jennings,*
16 Colo. 471, it is said:

" 'A statutory right to have cases reviewed on appeal
may be taken away by a repeal of the statute, even as
to causes which have been previously appealed.'   Cooley's
Const. Lim., section 474; (other citations).   The prin-
ciple applies to causes pending on appeal for trial *de novo*
as well as to those taken up for review.   (Citations)."

And in *Railroad Co. v. Grant,* 98 U. S. 398, the
supreme court of the United States, speaking through
Chief Justice Waite, said:

"But a party to a suit has no vested right to an ap-
peal or a writ of error from one court to another.  Such a
privilege once granted may be taken away, and if taken

away, pending proceedings in the appellate court stop just where the rescinding act finds them, unless special provision is made to the contrary."

This act, instead of stopping these appeals just where the rescinding act finds them, preserves to the parties their right to be heard on pending appeals. It simply stops the progress of an appeal in one court and transfers it to another with jurisdiction to determine it, thus affording to the parties a tribunal for the determination of pending appeals instead of stopping them and leaving them undetermined. The present act, not only preserves pending appeals, but provides that judgments of the court of appeals, in certain classes of cases, may be reviewed by writ of error from the supreme court. If the abolition of appeals would stop those pending where the rescinding act finds them, unless special provision is made to the contrary, then such special provision for the disposition of pending appeals, as is made in this act, cannot be said to be an unconstitutional exercise of legislative power in the absence of an express provision of the constitution inhibiting such exercise. The relators devote much space in their brief in a discussion to show that parties cannot be deprived of the right to a writ of error from the supreme court. The present act does not deprive anyone of a writ of error from this court. On the contrary, it preserves the writ of error precisely as it was before the passage of the act, and in addition, in section 4, the remedy by writ of error is extended to such instances where it may not have extended before, so that the discussion of this question raised by relators would be altogether *obiter*. The question which may arise in this case, relating to writs of error, is whether or not the provision in the act is valid, providing that writs of error, now or hereafter pending in the supreme court, may be trans-

ferred to the court of appeals and there determined by the election of the parties. The act does not deprive the parties of any right, which they may have, to have their writs of error determined in the supreme court. It simply gives them the choice of an additional tribunal in which such causes may be heard. And further, if election is made to have a cause on error determined by the court of appeals, then, in certain classes of cases, writs of error will lie from this court to review the judgment of the other. In this way, no party is deprived of the privilege or right, if he has one, to have a writ of error determined by the supreme court, unless he so elects, and his election is conclusively presumed from his failure to object in apt time. His election does not confer jurisdiction on the court of appeals over the subject matter of any cause. That jurisdiction is conferred by the act itself, and when the party, within the time specified in the statute, after due notice, fails to file his petition to have his cause remanded to the supreme court, then by consent he confers jurisdiction over his person and the particular case, and that court having such jurisdiction its judgment is certainly binding. The finality of the decision of the court of appeals is not a result brought about by the statute, but it is a result of the litigant's own choosing. Knowing that the decision will be final, he deliberately chooses his forum. No right that he may have, constitutional or statutory, is taken away from him against his will. He waives those rights by his deliberate choice. The argument of the relators in this regard savors more of an argument against the policy of such a proceeding than against its constitutionality. The relators concede that a litigant may waive his constitutional rights. If this is so, then undoubtedly he can waive any statutory right. They contend, however, that the rule

that a litigant may waive his constitutional rights will not admit of conferring jurisdiction by consent. That is true with reference to jurisdiction of the subject matter, but, as has been seen, the statute confers jurisdiction over the subject matter, and not the consent of the parties. In the act under consideration in the Richmond case there was a similar provision for transfers, covering writs of error, from the supreme court to the former court of appeals, and it provided for notice and objection similar to the present act. Notwithstanding that many writs of error were transferred to and determined by the court of appeals, no litigant, in any manner, attempted to challenge the legality of the provision. That a party to a civil cause, such as the present act deals with, may waive a constitutional or statutory right is so well settled that it is hardly necessary to quote any authorities.

In *Newark Pass Ry. Co. v. Kelly,* 57 N. J. L. 655, at 676, it is said:

"The circuit court possessed, by law, jurisdiction over the cause of action disclosed by this record. While consent cannot confer upon a tribunal a jurisdiction not vested in it by law, yet parties may, by consent, permit a tribunal to acquire, though irregularly, a jurisdiction which the law has conferred upon it."

"As a general rule, subject to the exceptions hereafter noted, a party may waive any legal right to which he is entitled. Rights growing out of contracts may, of course, be waived, likewise rights conferred by statute, and constitutional rights may be waived by the party in whose benefit the rights accrue." 29 Am. and Eng. Ency. of Law, 1107. The exceptions noted in the Encyclopedia do not include any such a case as is here presented. It is unnecessary to proceed further in answering the contentions of the relators, for the discussion would necessarily

be a repetition of the opinion in the Richmond case, where all the fundamental questions that are pertinent to the present case raised by these relators were resolved against them. The discussion in that case was full, complete and lucid. To uphold relators' contentions it would have to be overruled, and after a careful perusal of it, we prefer to abide by it, for we can find no justification for its overthrow. He who asserts the unconstitutionality of a statute has the burden of showing that it is unconstitutional. This burden is vastly increased, when, in order to find a statute unconstitutional, a decision of our court supporting the constitutionality thereof must be overruled. There is nothing in the act or the circumstances attending its adoption of an intent by the legislature to lessen the dignity or standing of the supreme court. It still remains, as it was before, the head of the judicial system of this state. The new court of appeals, as well as all other courts, remain subordinate to it and there is none coordinate with it. It still possesses the power and dignity conferred upon it by the constitution.

Having answered the first question in the affirmative, we will proceed with a discussion of the second, that is, were the appointments by the governor valid? After being passed by the general assembly with an emergency clause, the bill for the present act was presented to the governor on May 4, 1911. On May 6th the general assembly adjourned *sine die,* and under the law neither the general assembly nor the senate would again meet in regular session until January, 1913. The governor retained the bill until June 5, 1911, on which day it was filed in the office of the secretary of state without any objections; in fact, without either the approval or disapproval of the executive. Under such circumstances, the act would have gone into effect in June, unless the initia-

tive and referendum amendment to section 1 of article V
of the constitution postponed its taking effect for a period
of ninety days after the adjournment of the general
assembly, in which latter event the act would have gone
into effect in August.  It can, therefore, be said that the
act took effect in June or in August, but at which time it
is not necessary in this case to determine, for in either
event it was during a recess of the senate.  In August,
after the act went into effect, these respondents were ap-
pointed by the governor and entered upon the discharge
of the duties of judges of the new court.  Some conten-
tion is made by relators relative to the wording of the
order appointing the respondents.  This may be dismissed
with the remark that we must assume that the governor
intended only to do what he was authorized to do by the
act and the constitution of this state, and the respondents
are here claiming only to be persons appointed to dis-
charge the duties of the offices of judges of the court of
appeals until the next meeting of the senate, under sec-
tion 6 of article IV of the constitution.

Section 1 of the act is, so far as need be noticed now,
as follows:

"Section 1.   That there be and is hereby established
a court to be known as the 'court of appeals,' which shall
exist for a period of four years from the date upon which
this act shall take effect.   *   *   *   Said court shall con-
sist of five judges who shall possess, etc.   *   *   *
Upon the taking effect of this act, the governor shall,
with the advice and consent of the senate, appoint said
judges to serve during the existence of said court, desig-
nating one of them as presiding judge, but no such
appointment shall take effect until a confirmation thereof
by the senate, except that in case of vacancy through
death, resignation or removal from office, the governor

.shall·fill the same until the next session of the legislature, when the senate. may confirm or reject the appointment .so made.  Said judges shall enter upon the duties of their office immediately upon their appointment.   Vacancies .shall be filled in the same manner as the regular appointments are required to be made.  ·*   *   *"

Section 4 of the act provides, among other things, .that "the jurisdiction of the supreme court on appeal, .even as to causes already pending therein shall,   *   *   * terminate upon the taking effect of this act, except for the purpose of entering the order of transfer hereinafter :provided for."   And, thereafter, the section provides that the supreme court should order the appeals transferred to .the court of appeals upon its organization.

It is clear from these sections that when the act took ·effect, the court of appeals was established and the court, .as well as the offices of judges thereof, were then in existence.   When the act went into effect, the offices existed without incumbents, and with no one ready to fill them, and the governor was unable to make the original appointments as therein provided, for the senate had adjourned and was in recess.   Vacancies then existed in the offices, and these vacancies occurred during the recess of the senate.   That such was the condition, is settled beyond controversy by the case of *People v. Rucker*, 5 Colo. 455. In that case, this court had under consideration the provisions of an act creating and establishing· a criminal court in Lake County.   The first section of the act established the criminal court of Lake County, and it was provided that:

"The governor shall, immediately after this act takes effect, appoint, with the advice and consent of the senate, a person possessing the necessary qualifications as judge of said court, and all vacancies in said office shall be filled

in the same manner; provided that all vacancies occurring during the recess of the senate, may be filled by appointment by the governor, but such appointment shall expire at the end of the next session of the senate."

This court, in commenting upon that act, said:

"Under the act in question, the appointment was to be made 'immediately after the act took effect, and with the advice and consent of the senate.' Immediately would mean within a reasonable time, having reference to the act to be done. The 'advice and consent of the senate' being necessary, the hour of the adjournment of that body would mark the extreme limit of time within which the appointment was to be made. Had the act been signed prior to the adjournment, and no appointment made, immediately upon adjournment there would have been a vacancy, by reason of the failure of the appointing power to exercise it. In this case, the bill not having been signed until after the adjournment, the governor was unable to act under the provision for filling the office, 'with the advice and consent of the senate.' Upon approval the act took effect immediately; the time within which the executive was required to appoint had expired, and inability to act was followed by a vacancy, the same as in case of a failure to act."

So much of section 6 of article IV of the constitution, as is applicable here, reads:

"The governor shall nominate, and by and with the consent of the senate, appoint all officers whose offices are established by this constitution, or which may be created by law, and whose appointment or election is not otherwise provided for, * * * If during the recess of the senate a vacancy occur in any such office, the governor shall appoint some fit person to discharge the duties

thereof until the next meeting of the senate, when he shall nominate some person to fill such office."

The offices of judges of the court of appeals were created by law. This court has held that the words "not otherwise provided for," in the above mentioned section 6 of article IV of the constitution, refer, not only to original appointments to office for the term, but also to the filling of vacancies, and that the method prescribed by the statute for the filling of vacancies must be followed. *People v. Osborne,* 7 Colo. 605, unless, of course, the constitution, in some other part, may provide for the filling of a vacancy in a particular office, as was the case in *People v. Rucker, supra.* In the case at bar, however, the constitution does not provide in some other part for the filling of a vacancy occurring in such an office as that of judge of the court of appeals. This court has also said that if no provision is made in the statute for filling vacancies, then the constitutional provision that if a vacancy occur in an office during the recess of the senate, "the governor shall appoint some fit person to discharge the duties thereof until the next meeting of the senate," would be in force. *People v. Osborne, supra.* From this it necessarily follows that if a method is prescribed by the statute for the filling of vacancies, requiring the joint action of the governor and senate, and time must expire between its occurrence in the recess of the senate and the time that the statutory method of filling it can be employed, the constitutional regulation for the appointment *ad interim* must be resorted to for the intervening time. The present statute must, therefore, be examined relative to its provisions for filling vacancies. Before doing this, it is well to understand what filling vacancies means. The term "vacancies" does not apply to the incumbent but to the term or the office, or both, depending generally on the

context.—*People v. LeFevre,* 21 Colo. 218, 230; *People v. DeGuelle,* 47 Colo. 13, 21.

If the incumbent of an office for the term of four years dies in a year, the vacancy cannot be completely filled until someone is elected or appointed to fill the office for the unexpired term. There is a provision that in case of a vacancy in the office of a district judge, the governor shall appoint a person to fill it until the next regular election, when someone shall be elected to serve for the unexpired term. It cannot be said that the governor fills the vacancy—it is only partly filled, if at all, by him. He fills it until the election, and the electors fill it for the balance of the term. Strictly speaking, the governor and the electors fill the vacancy that existed at the time of its occurrence, so that when a statute speaks of filling a vacancy, without any qualifications or limitation, it means just what it says, the filling of the vacancy, and to do that the office must be filled for the whole of the unexpired term. Such is the view taken in *Monash v. Rhodes,* 11 Colo. App. 404. There, a provision of the charter of Denver created the office of member of the board of public works and provided that it should be originally filled by appointment by the governor, with the advice and consent of the senate, and that the governor should have "power to fill vacancies in vacation of the senate by appointment in writing filed with the secretary of state." One of the rival claimants contended that the governor, under this power, could fill the vacancy occurring, only until the meeting of the senate, and the other that the governor had the right to fill it for the whole of the unexpired term, which extended beyond the meeting of the senate. The latter view was upheld, and in the course of its opinion, the court of appeals said:

"As we take it, and according to our view of the word 'vacancy' as used in modern times, it relates not only to the office which is to be filled, but to the term for which the appointment is to be made. It is constantly used in statutes and constitutions with reference to both office and tenure, and we believe that the proper interpretation of the word when power is given to an executive or a board to fill a vacancy, is, a power to fill the office designated for the unexpired term which may remain after the death, removal, or resignation of the antecedent incumbent. In other words, when the incumbent dies, is removed, or resigns, there is a vacancy not only in the office, but in the term for which he was appointed, if that was for a definite period. It usually happens that the legislature provides that the appointment shall be for the unexpired term, to the next general election, or for such other period as their wisdom may dictate."

This reasoning of the court of appeals was concurred in by this court in *Monash v. Rhodes*, 27 Colo. 235, 237, where it was said :

"We fully concur in its (the court of appeals) construction of this provision of the charter, and in its conclusion that the power conferred upon the governor thereby authorized him to appoint appellee for the unexpired term; and that he was not required to submit the appointment to the incoming senate for confirmation."

The constitutional regulation aforesaid, providing for *ad interim* appointments, plainly refers to cases where the joint action of the governor and the senate is necessary to fill a vacancy. Its very language indicates that such appointments, by the governor, are not intended to fill vacancies. It does not say that he shall appoint some fit person to fill the vacancy or the office until the senate meets, but "to discharge the duties thereof until the next

meeting of the senate, when he shall nominate some person to fill such office," and "to fill such office" undoubtedly means for the unexpired term. So that the governor in making *ad interim* appointments does not fill a vacancy.

The statute will now be examined in search of a provision relative to filling vacancies. With reference to appointments, it first provides:

"Upon the taking effect of this act, the governor shall, with the advice and consent of the senate, appoint said judges to serve during the existence of said court, designating one of them as presiding judge, but no such appointments shall take effect until a confirmation thereof by the senate."

This plainly refers to the original appointments for the full term, for the appointments are to last during the existence of the court. The relators admit this and say that the act is peculiar in that it authorizes appointments only for the full term. If this were true, it would be unnecessary to go further, for in that event the filling of vacancies would not be "otherwise provided for," and the constitutional provision would undoubtedly govern. The words "but no such appointment shall take effect until a confirmation thereof by the senate" undoubtedly refers to appointments for the full term, for the words "no such appointments" plainly refer to the appointments mentioned before, and those appointments were the original appointments to serve during the existence of the court. These appointments were to be made upon the taking effect of the act. Here, however, precisely as in the case of *People v. Rucker, supra,* when the act took effect the senate had adjourned *sine die* and was in recess. That case establishes that the hour of adjournment of the senate on May 6th marked the extreme limit of time within which the original appointments for the term

could be made, that the time within which the executive was required to appoint had expired, and that vacancies followed. Under the authority of the *People v. Osborne, supra,* it became necessary to resort to the provisions of the statute for filling them, and if the filling of the vacancy or any part thereof was not provided for in the statute, as to the part not provided for, it became at once the right of the governor to appoint some fit person to discharge the duties of the office as provided in the constitution. After the above quoted part of the statute follow the words, "except that in case of vacancy through death, resignation or removal from office, the governor shall fill the same until the next session of the legislature, when the senate may confirm or reject the appointments so made." This clause, though in form an exception, is not one, but is an independent clause. Anything that is embraced in an exception must be included in that from which it is excepted. The appointments mentioned in the sentence preceding the apparent exception are the original appointments for the term and do not include the appointments referred to in the apparent exception, which are appointments after a previous incumbency, and the occurring of a vacancy through the designated causes. The appointments to be made after the occurrence of vacancies happening from the designated causes are to be made until the next session of the legislature, when the senate may confirm or reject them. The language leaves some doubt there. The appointment is to be made for a limited time. In case the senate confirms it, it may be that the statute may be helped by implication and it may be said that the limited appointment is converted, by the confirmation, into one to fill the vacancy and it is filled. But what is to be done if the senate rejects this limited appointment? There is only one appointment to

be submitted, one made some time before.   How is the vacancy to be filled if the senate rejects this appointment? It must be admitted that the statute thus far is not clear even as to the filling of vacancies from the designated causes.   The last clause of the section clarifies the situation.   It provides that, "Vacancies shall be filled in the same manner as the regular appointments are required to be made."   The filling of vacancies referred to here is unqualified and unlimited in any manner.   Applying here the rule announced in *Monash v. Rhodes, supra,* it undoubtedly means the permanent filling of vacancies for the unexpired term.   This becomes certain when we consider that under this provision of the statute the vacancies are to be filled by the governor, with the advice and consent of the senate.   Who would say that under such a provision the governor may submit to the senate an appointment for only a part of the unexpired term?   The proposition would involve an absurdity.   If a vacancy occur when the senate is in session, the governor is at once able to fill it as the act provides; but if the senate is in recess and the vacancy happens, the governor is unable to fill it when it takes place.   In any event, time of longer or shorter duration must expire between the happening of a vacancy in recess and the meeting of the senate when the governor may fill it.   As to the filling of the vacancy, or the appointment of a fit person to perform the duties of the office during this intervening time, the statute is absolutely silent.   This being so, under the decision of the *People v. Osborne, supra,* it is the right and duty of the governor under the provision of the constitution, when such a vacancy occurs in the office, to "appoint some fit person to discharge the duties thereof until the next meeting of the senate, when he shall nominate some fit person to fill such office."   It cannot

be said that he may do this if the intervening time is
long, but that he may not do it if it is short.  Take the
provision of this statute, that the governor may fill a
vacancy through death, until the next session of the legis-
lature.  If one of the judges should die eighteen months
before the legislature meets, the governor can fill the
vacancy until the meeting, and he can equally as well
fill the vacancy if the death occurs but a week before the
legislature is to meet.  Now, in the present instance,
when the act went into effect, there were vacancies in the
offices of the judges of the court of appeals, occurring in
a recess of the senate, and it was provided in the statute
that those vacancies were to be filled by appointment by
the governor, with the advice and consent of the senate.
The governor was unable to fill these vacancies as the
statute provides and would be unable to do so until the
next meeting of the senate.  The statute not providing
for the filling of these vacancies or the appointment of
suitable persons to perform the duties thereof during the
time intervening between the occurring of the vacancies
and the meeting of the senate, the governor exercised his
constitutional right in such a case to appoint the re-
spondents as fit persons to discharge the duties of these
offices until the next meeting of the senate.  The respond-
ents entered upon the discharge of said duties and ever
since have been and now are discharging them, and the
senate has not been in session since their appointment.
They undoubtedly entered lawfully upon the discharge
of those duties, and, under the facts present, there is no
power or authority existing anywhere to oust them
from the positions they now occupy until the happening
of the event that will enable the governor to fill the
vacancies existing in these offices.

The relators contend that, under the provisions of section 9 of article IV of the constitution, the governor could have called the senate in extraordinary session, submitted to it his appointments and had them confirmed; whereupon, the offices would have been filled. Were this true, the conclusion reached would be the same, for of necessity a period must elapse between the time the vacancies occurred and the meeting of the senate, during which period the constitutional provision would be operative, and the facts are that the respondents were appointed during that period and the senate has not met. The confirmation of the appointments, whether original or to fill vacancies, at an extraordinary session of the senate, was not within the contemplation of the act or the general assembly that passed it, for the following reasons:

1.   Because the calling of an extraordinary session of the senate is within the discretion of the governor. Many things might combine to shape the exercise of that discretion. After due consideration, the governor might conclude that it would be unwise to call such a session, in which event a period of at least fifteen months would pass before any appointments would be made and before such vacancies as occurred could be filled. Such a session was an event too uncertain for reasonable men to select as a beginning for the work of a court which they had created and which, as is shown by language and provisions of the act itself, they desired to go into immediate operation, and, as seen from the Rucker case, as early as the adjournment of the general assembly then in session.

2.   Because the act itself indicates that the confirmations mentioned therein were intended to be made at regular sessions of the senate, for the act, at the only place designating the sessions specifically at which con-

firmations were to be made, says they shall be made at
the next session of the legislature, and then the senate
would be in regular session.

3.   Because, (and this reason is sufficient in itself)
according to the Rucker case, the original appointments
for the term had to be made during the session of the
general assembly which passed the act, or not at all, and
that was declared by this court in that case, notwith-
standing that the constitutional provision for the calling
of an extraordinary session of the senate existed then as
now.   The act under consideration in the Rucker case
had the same provisions for the making of the original
appointments for the term as the act under consideration
here.   With the same provisions in this act, with refer-
ence to the appointments, and the same constitutional
provision for the calling of an extra session, this court
must now overturn the Rucker decision, unless it be con-
cluded that the last general assembly did not have in con-
templation the calling of such a session.   If we would be
right now in saying that it did, this court was wrong in
the Rucker case in ignoring such a session, and in saying
that the right of the governor to make the appointments
ceased with the adjournment of the assembly.   We must
presume that the general assembly knew the law, as
declared in the Rucker case; that they intended to fol-
low it, and knowing it and so intending, they could not
have had in contemplation an extraordinary session of
the senate.

It is plain from the act that no person can be ap-
pointed a judge of the new court for the term or for an
unexpired portion thereof without the confirmation of
the senate.   It is contended that the first or initial appoint-
ment of persons to discharge the duties of the offices
must receive the sanction of the senate before such per-

sons are qualified to act. This contention finds no support in the act, or the constitution, or the decisions of this court, or at all. There is no language in the act that can be reasonably construed as supporting it. It must now be apparent from the preceding discussion that to uphold such a contention we must overrule the Rucker case and hold that no vacancies existed, forget the provisions of the act for filling vacancies, overrule the case of *People v. Osborne,* ignore the constitutional provision for *ad interim* appointments and place the general assembly in the unreasonable and absurd position of creating a court and the offices of five judges for the immediate relief of a congested condition of this supreme court; providing that the new court and the five offices shall come into being when the act takes effect; at the same time depriving this court of jurisdiction of about one-half of the cases pending before it, and transferring them to the new court; making the life of this new court, that was to dispose of these many cases and many more to be sent to it, only four years, and at the same time and in the same act, with deliberate intent, making provisions which they must have known would prevent any work by this newly created court for a period of at least fifteen months, and which for the same period would keep the court, offices, relief intended, cases over which jurisdiction has been taken away and conferred on the new court, suspended in mid air. We shrink from undertaking the enormous task of supporting such a contention, and content ourselves with upholding and abiding by the act, the constitution of this state and the former decisions of this court.

The provisions that the court and the offices were to exist and this court deprived of jurisdiction in such a large number of cases, when the act took effect, the use

of the word "immediately" in the act, with reference to
the doing of certain things, indicate that it was the in-
tention of the legislature that the new court was to go
into immediate operation. The growth of litigation in
this state has kept pace with the wonderful growth in
population, wealth and diversity of industries. From
territorial days down to the present time, notwithstanding
diligent and earnest endeavor and notwithstanding that
the legislature has attempted to afford relief from time
to time, the number of cases on this docket, in excess
of those disposed of, has steadily increased. The aboli-
tion of the former court of appeals, in 1905, placed upon
the docket of this court, already heavily overladen, about
600 additional cases. The new cases coming to this
court have steadily increased. As a result of all this,
the docket of this court was congested to such an extent
that the delay incident to such a condition was regarded
and felt by many to be a denial of the right, guaranteed
by our constitution, to a remedy for every legal injury
and to enjoy that remedy without delay. It was to relieve
this serious condition and to afford that speedy determina-
tion of causes assured by the constitution that the new
court was established. The relator bar association, and
like associations throughout the state, had, for some time,
been discussing the question of securing relief from the
serious situation with which parties to litigation were con-
fronted with respect to review, and had themselves sug-
gested the new court as a means of relieving that situa-
tion. During the oral argument, it was said by the presi-
dent of the relator bar association that the object of this
action was to set at rest some doubt that had existed in
the minds of some of the profession relative to the legal-
ity of the new court, and of the appointments made by
the governor, so that the new court and these respond-

ents, if their appointments were found to be legal, might at once proceed in the performance of their duties, with the confidence of litigants in their legality, or if either the court or the appointments should be. found illegal that then some other steps might be taken at once looking towards the desired relief. So that beyond question the paramount object of this act was to relieve this serious situation, and to immediately begin the work of such relief. Thus, the conclusion we have reached is in harmony with the paramount objects and purposes of this act, and enables them to be carried out. That this affords further support to our conclusion is settled by decisions of this court. In *Carlisle v. Pullman Co.*, 8 Colo. 320, 327, it is said:

"Chief among the considerations to be weighed in the construction of a statute are the objects to be accomplished, the evils to be remedied, and the circumstances under which it was enacted."

And in *Murray v. Hobson,* 10 Colo. 66, 73:

"Among other well established rules of construction are these: That statutes are to be construed with reference to the objects to be accomplished by them, and with reference to the circumstances existing at the time of their passage, and the necessity for their enactment."

And in *Ellet v. Campbell,* 18 Colo. 510, 518:

"In resolving this question, as in other cases of like nature, the meaning and application of the statute is to be ascertained by considering its origin, its history, its purposes and objects, as well as its subject-matter and the language employed."

Having considered the act in the light of the previous decisions of this court and the constitution, and concluding that the respondents are entitled to remain where they are, its paramount objects and purposes are

carried into effect, and any other conclusion would re-
sult in their defeat.   This result being thus strongly fort-
ified, no other conclusion can, by any sound process of
reasoning, find support.

Both questions presented having been answered in
the affirmative, the petition must be dismissed and judg-
ment go for respondents, and it is so ordered.

Decision *en banc:*

Mr. JUSTICE GABBERT dissents.   Chief JUSTICE
CAMPBELL not participating.

———————

Mr. JUSTICE GABBERT, sustaining the constitution-
ality of the act, and dissenting from the conclusion that
the appointment of respondents is valid, delivered the fol-
lowing opinion:

I fully concur in the conclusion, that the act is con-
stitutional, but in view of the importance of the ques-
tions urged upon our attention by counsel for relators
against its constitutionality, I have concluded to express
my views on that subject.   It is entitled "An act in rela-
tion to courts of review," and its provisions, the con-
stitutionality of which are challenged, or which relate to
that question, are as follows:

"Section 1.   That there be and is hereby established
a court to be known as the "court of appeals," which
shall exist for a period of four years from the date upon
which this act shall take effect and shall exercise only
such jurisdiction as is hereinafter conferred upon
it  *  *  *."

"Section 3.   Said court of appeals shall have juris-
diction to review and determine all judgments in civil
causes now pending upon the docket of the supreme

court, or wherein appeals were perfected prior to the taking effect of this act or that may hereafter and during the life of the court of appeals be taken to the supreme court for review, save and except writs of error to county courts."

"Section 4.   The statutes granting and regulating appeals from the district and county courts to the supreme court shall be, and the same are hereby repealed and the jurisdiction of the supreme court on appeal even as to causes already pending therein shall, save as in section 6 hereinafter provided, terminate upon the taking effect of this act, except for the purpose of entering the order of transfer hereinafter provided for.   Such repeal, however, shall not operate as a dismissal of said pending appeals or of appeals perfected but not yet docketed; all such appeals shall, immediately upon organization of the court of appeals or thereafter and upon the docketing thereof, be transferred by order of the supreme court to its docket for hearing and determination.   And the decision of the court of appeals in all such cases shall, except as to those specified in said section 6, be final and conclusive.   This provision shall apply also to special proceedings wherein appeals to the supreme court are now allowed by law; but in all such cases the remedy by writ of error is hereby substituted for the remedy by appeal. Supersedeas bonds in connection with all writs of error hereafter taken to review ordinary actions at law or in equity or special proceedings, shall be conditioned as now provided by statute in such cases."

"Section 5.   The supreme court is also hereby authorized to transfer to said court of appeals for hearing and determination, by suitable orders in the premises, such other civil causes now or hereafter and during the life of said last mentioned court, pending before the

supreme court on error, as it may deem advisable, omitting, however, writs of error to county courts. And immediately upon such assignment and transfer of causes so pending on error, the clerk of the court of appeals shall, by registered mail, notify the parties to each of said causes or their attorneys of record, of such transfer, and advise them that unless within thirty days from the date of said notice a petition be filed requesting that the same be remanded to the supreme court, a waiver by consent will be conclusively presumed of the right or privilege, if any such right of privilege exists, to a hearing and determination of the writ of error by the supreme court. And if either of the parties or his attorneys, to a cause thus removed, shall, within the time above specified, file such petition to remand, the same shall be at once returned to the supreme court docket for final consideration and decision. But in all cases pending on error thus transferred, wherein no such petition be filed within the 30 days mentioned in the notice, the decision of the court of appeals shall, with the exceptions specified in section 6 of this act, be final and conclusive."

"Section 6. Provided, however, that in causes thus transferred from the supreme court to the court of appeals, whether pending on appeal or error, wherein the decision necessarily involves the construction of a provision of the federal or state constitution, or relates to a franchise or freehold, or a judgment for more than $5,000, exclusive of costs, such decision thereof by the court of appeals shall not be final. Such cases may be reheard in the supreme court by writ of error from the latter court, under rules to be adopted by it. Or if, before a hearing in any case, either party thereto shall advise the court of appeals that it belongs to one of the classes of cases in this section above specified, and the

court shall upon investigation so find, it shall at once and without further proceedings remand the same to the supreme court for determination."

"Section 7. The court of appeals shall have the power to adopt rules regulating the procedure therein in the same manner and with like effect as the supreme court; Provided, that such procedure shall be, so far as practicable, similar to that of the supreme court. It shall be a court of record and have a seal and shall also have power to issue all necessary and proper writs and processes in aid of its jurisdiction, in the same manner and with the same effect as the supreme court　*　*　*." Session Laws 1911, 266 *et seq.*

In support of the contention of counsel for relators, that the act is unconstitutional, it is urged that it is in conflict with our fundamental law, because it purports to take from the supreme court a part of its final appellate jurisdiction, vested in it by the constitution, and bestow it upon the court of appeals; because it purports to deprive the supreme court and litigants therein of the use of the writ of error or its equivalent as a writ of right running to all judgments of courts of record in this state contrary to the whole theory of the constitution and the common law principles and rules giving the writ of error as a writ of review and a writ of right; because by its terms it is made to operate retroactively, in terminating the jurisdiction of the supreme court already in exercise, and attempts to confer jurisdiction on the court of appeals in certain cases by consent or waiver of the litigants; and finally, that it does not comply, and is in conflict with section 21, article V of our constitution, which requires that no bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title.

By the constitution, "The judicial power of the state as to matters of law and equity, except as in the constition otherwise provided, shall be vested in a supreme court, district courts, county courts, justices of the peace and such other courts as may be provided by law."

"The supreme court, except as otherwise provided, in this constitution, shall have appellate jurisdiction only, which shall be co-extensive with the state, and shall have a general superintending control over all inferior courts under such regulations and limitations as may be prescribed by law."

"It shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction, and other original remedial writs, with authority to hear and determine the same;  *  *  *.   The supreme court shall give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives;  *  *  *." Sections 1, 2 and 3, article VI.

From these provisions it appears that the general assembly is clothed with power to create other courts than those therein designated and may therefore create an intermediate court of review.   *People v. Richmond,* 16 Colo. 274 (279).   It is patent from the constitutional provisions quoted that the supreme court is placed at the head of the judicial system of the state, and any act of the legislature purporting to interfere with its existence, supremacy, or the nature of its jurisdiction or duties, would, to that extent, be invalid; consequently, a court of coordinate final jurisdiction cannot be established by statute, for every tribunal thus created, as well as those named in the constitution, must be inferior to the supreme court, subject to its superintending control, and governed by its decisions.—*People v. Richmond, supra* (279).

. . . The act in question creates the court of appeals for a specific purpose, of which we ·take judicial notice, namely, to relieve the docket of the supreme court. To this end it provides that the court of appeals shall have jurisdiction, under certain restrictions, to review and determine all causes pending in the supreme court at the time the act takes effect, save and except writs of error to county courts. The jurisdiction of the supreme court to determine cases on appeal, upon the act taking effect, is terminated, and thereafter causes can only be taken to this tribunal on error. All appeals pending in the supreme court immediately upon the organization of the court of appeals shall be transferred to it for hearing and determination. The supreme court is also authorized to transfer to the court of appeals, for hearing and determination, such causes pending or brought to the supreme court on error as it may deem advisable, omitting, however, writs of error to county courts. When causes pending on error authorized to be transferred to the court of appeals reach that tribunal notice shall be given to the parties, or their attorneys of record, of the transfer, advising them that unless, within thirty days of the date of such notice, a request is made to remand to the supreme court, a waiver by consent will be conclusively presumed of the right or privilege of a hearing and determination by the supreme court. If a request to remand is made, the cause shall at once be remanded to the supreme court. · The judgment of the court of appeals in all cases which, by virtue of the foregoing provisions it is authorized to hear and determine, shall be final and conclusive, save and except cases where a decision necessarily involves the construction of constitutional provisions, either state or federal, or involves a franchise or free-hold, or where the judgment reviewed

is for more than the sum of five thousand dollars, exclusive of costs. The court of appeals is made a court of record; is authorized to adopt rules regulating the procedure therein, with the same effect as the supreme court, and is empowered to issue all necessary and proper writs and processes in aid of its jurisdiction. These, in brief, are the salient features of the act creating the court of appeals, defining its jurisdiction and authority.

The main question, therefore, presented for determination on the subject of the constitutionality of the act, except the one relating to its title, is, whether it purports to deprive this court of its constitutional authority, or litigants of their constitutional rights.

The first question, then, is, does the act purport to make the court of appeals a court superior to, or of coordinate jurisdiction with, the supreme court? I think this question must be answered in the negative. Its jurisdiction is limited to the cases which the supreme court is required to, or may, transfer to it. It is not vested with any superintending control over inferior tribunals, nor with any original jurisdiction, whatever; neither is it authorized to answer executive or legislative questions; and, impliedly, it is not authorized to consider any causes brought to the supreme court from the county courts on error. No attempt is made to interfere with the jurisdiction and authority of the supreme court to hear and determine all cases brought to it on error from other inferior tribunals of record subsequent to the organization of the court of appeals, although cases then pending on error or brought to it by that procedure thereafter may be transferred to the court of appeals, except those on error to county courts. In fact, from that date, it is vested with authority to hear and determine all cases then pending or brought to it on error from all inferior courts

of record, excepting the court of appeals, without regard
to the amount of the judgment or questions involved. It
is only obligatory on the supreme court to transfer causes
therein pending on appeal at the time the court of appeals
was organized. That tribunal is authorized to issue
writs, but they are in no sense any of the original or
remedial writs which the supreme court, by the consti-
tution, is alone empowered to issue. On the contrary,
the only writs the court of appeals can issue are those
which will enable it to enforce and exercise its jurisdic-
tion over those cases transferred to it by the supreme
court. Causes transferred as pending on appeal, the
decision of which necessarily requires a construction of
a provision of the federal or state constitution or involves
a franchise or a free-hold, or where the judgment, ex-
clusive of costs, exceeds five thousand dollars, may be
reviewed on error by the supreme court; or if before
a hearing in the court of appeals, either party advises it
that a case involves a decision on either of these ques-
tions, and the court so determines, it shall at once re-
mand the case to the supreme court for determination.
Causes transferred as pending on error may also be re-
manded if application to that end is made in apt time.
It thus appears that in no respect is the court of appeals,
by the statute creating it, made a court of co-ordinate or
superior jurisdiction to the supreme court; that it is not
vested with any authority or powers conferred upon the
supreme court alone by the organic law of the state, un-
less it be that the constitution inhibits an intermediate
court of review whose judgment shall be final—a proposi-
tion I shall consider later; that in specific cases its judg-
ments may be reviewed by the supreme court; that in
every respect it is inferior to the supreme court, and
therefore, subject to its superintending control, and that

by virtue of this authority, its judgments, which by the act are specified as final and conclusive, would be subject to review on certiorari in at least two instances: (1) Where it was without jurisdiction; and (2) where, in a clear case, it refuses to be governed or guided by the law, as laid down in the previous decisions of the supreme court.—*People v. Court of Appeals, 27* Colo. 405.

The next question naturally presented is, whether the act, by prescribing that the judgment of the court of appeals shall be final in certain cases, is unconstitutional. This proposition can only be answered in the affirmative upon the theory that by the constitution, no judgment of a court of review can, by legislative enactment, be declared final, except the judgment of the supreme court. This identical question was considered and determined in *People v. Richmond, supra.* The former court of appeals act, passed in 1891, provided that its judgment in all cases should be final, where the judgment reviewed, or in replevin the value found was twenty-five hundred dollars or less, exclusive of costs, except upon writs of error to judgments of county courts, unless a decision involved a franchise or free-hold, or where the construction of a provision of the state of federal constitution was necessary, in which instances the act provided that the judgment of the court of appeals might be reviewed by the supreme court on appeal or error. Mills' Code, sections 406d, 406e. The act was attacked in the case cited upon the ground that the legislature could not confer upon the court thereby created authority as a court of review, to pronounce a final judgment in any case. Passing upon that proposition, it was held (quoting from the syllabus):

"The constitution confers and defines the jurisdiction of the supreme court, but it does not inhibit the legislature from regulating, to some extent, the quantum of

its business by reasonably contracting or enlarging the limits of such jurisdiction. The constitutional policy is not to specify absolutely the extent and boundaries of the jurisdiction of all courts, but to allow a large legislative discretion in connection therewith."

On this subject, in the opinion it was said (281):

"An extensive legislative power to regulate the exercise of judicial authority is an imperative necessity. A constitutional provision unalterably defining and fixing in all respects such jurisdiction would be a serious misfortune. The constitutional policy seems to have been not to specify absolutely the extent and boundaries of the jurisdiction of all the courts, but to allow a large legislative discretion, so that the varying demands and the ever-changing necessities of the people may from time to time be adequately provided for."

What was there held, is certainly applicable here. The object of the act is to relieve the docket of the supreme court, by providing a tribunal of a temporary nature, vested with authority to finally dispose of certain cases pending in this court, by which means the causes pending here, and those remaining after the transfer of appeals, as well as those brought to the supreme court on error after the organization of the court of appeals, would be more speedily determined. The crowded state of the docket and the delay incident to disposing of the cases from this condition, certainly presented a situation which authorized the general assembly, in the exercise of a sound legislative discretion, to relieve.

But it is said that the act is unconstitutional because it purports to deprive litigants of the right to have this court review the judgments of courts of record on error. This assertion is based upon the assumption that under

the constitution the supreme court is empowered to review all such judgments by writ of error, and that, therefore, it cannot be deprived of this authority, nor litigants of this right by legislative action, and as certain judgments of the court of appeals are declared to be final and conclusive, the result is that the constitutional authority of the supreme court and the constitutional rights of litigants are invaded. This question was considered and determined in the Richmond case, where it was held that writs of error from the supreme court may be forbidden by statute, unless preserved by the constitution. But that instrument only saves this proceeding so far as ordinary appellate purposes are concerned, to review the judgments of county courts. In other words, except as to judgments of county courts, the writ of error from the supreme court is subject to legislative control.

In addition to the reasons advanced in the opinion in that case, why the contention made is not tenable, it can be said that if by the constitution the writ of error was preserved so as not to be subject to legislative control, it would have been wholly unnecessary to provide, as it has, in section 23, Article VI, that "writs of error shall lie from the supreme court to every final judgment of the county court."

The argument in support of the proposition that the act is unconstitutional because it operates retrospectively by terminating the jurisdiction of the supreme court as to causes pending therein on appeal, when the act creating the court of appeals took effect, is to the effect that litigants having causes pending in the supreme court at that time on appeal could not be deprived of the right to have them determined here, nor the supreme court deprived of jurisdiction which had already attached. In *Callahan v. Jennings,* 16 Colo. 471, we held that a statut-

ory right to have cases reviewed on appeal may be taken away by a repeal of the statute, even as to causes which have been previously appealed. This being true, it necessarily follows that the legislature is authorized to direct that causes pending on appeal in the supreme court may be transferred to another court of competent jurisdiction.

The validity of the act is attacked because of the provisions of section 5, to the effect that causes pending in the supreme court on error, except writs of error to county courts, may be transferred to the court of appeals, and that unless one or the other of such parties after notice of such transfer moves to remand to the supreme court within a time limited, the decision of the court of appeals shall be final, except the judgment is of that character which, by section 6, may be reviewed by the supreme court. This provision, it is stated, is invalid because jurisdiction can not be conferred upon a court by consent of litigants, nor can a litigant waive a constitutional right. Neither of these propositions is involved. In the Richmond case it was held that a litigant has no natural or inalienable right to a hearing in the supreme court except as guaranteed by the constitution. This is guaranteed only as to judgments of the county court, which is preserved by the act; consequently, the legislature has the authority to confer jurisdiction upon the court of appeals to hear, determine and render final judgment in certain cases which, by the act, the supreme court is authorized to transfer to the court of appeals. Hence, it follows, that parties to such causes do not waive any constitutional rights. The act gives them the option of waiving a hearing in the supreme court. This may be waived, but by so doing, a constitutional right is not waived. It may be, as said in the briefs of counsel, that

the section under consideration will cause transfers to be made back and forth, but that goes to its practicability, and not its validity.

It is urged upon our attention with vigor, that if it be conceded that the legislature may create courts of appellate jurisdiction, and define their authority, the functions, dignity and supremacy of the supreme court will be destroyed, and it may be left with only appellate authority to review judgments of the county courts. I think I have answered this proposition by stating that the supreme court is placed by the constitution at the head of the judicial system of the state; that the legislature can not interfere with its existence or supremacy, nor alter the nature of its jurisdiction or duties. The act, as I have pointed out, does not attempt to do that which, by the constitution, I have said the legislature is inhibited from doing. The legislature is vested with a sound discretion with respect to creating intermediate appellate courts, but as held in the Richmond case, should this discretion be abused by an attempt to interfere with the existence and supremacy of the supreme court, or to change the nature of its jurisdiction and duties, or to take away its utility, legislation of this character would be void.

At the oral argument it was urged that the act was unconstitutional because the title does not conform to section 21, article V, of the constitution. This provision is mandatory, and must be observed; but it must receive a reasonable construction. In construing it we have frequently held that if legislation embraced in an act is germane to the subject expressed in its title, the constitution is complied with. The act is entitled: "An Act in Relation to Courts of Review"; and I think that all matters therein contained are relevant to that subject. In my

opinion, the act is not unconstitutional for any of the reasons urged upon our attention.

I fully appreciate the importance of having the legal status of the court of appeals determined in a manner, if possible, which will enable it to at once enter upon the discharge of the duties and functions conferred upon it by law; but this desirability is wholly insufficient to justify either the executive or judicial departments to set at naught the will of the general assembly, lawfully expressed. In my judgment, the majority opinion accomplishes this result by a construction of section 1 of the act, which is wholly at variance with its intent and meaning on the subject of the authority of the governor to appoint the judges of the court of appeals.

The bill was passed and transmitted to the governor on the 4th of May last. The general assembly adjourned two days later. The governor filed the bill in the office of the secretary of state on June 5th, without his approval or disapproval. August 6th His Excellency, Governor Shafroth, by executive order, appointed respondents judges of the court created by the act, such appointments to take effect October 1st, following. Respondents accepted, and on October 2nd took their respective oaths of office, which they filed with the secretary of state. On that date, this court transferred to the court of appeals all cases pending on appeal. Ever since such transfer respondents have been exercising and performing, with respect to the causes so transferred, the judicial functions and powers prescribed by the act creating the court of appeals. At no time since the general assembly adjourned has the senate been in session. These facts present the concrete question, are respondents entitled to discharge the duties and perform the functions of judges of the court of appeals? A solution of that question de-

pends upon the construction of section 1 of the act, in connection with section 6, article IV, of the constitution. The latter is as follows:

"The governor shall nominate, and by and with the consent of the senate, appoint all officers whose offices are established by this constitution, or which may be created by law, and whose appointment or election is not otherwise provided for; * * *. If, during a recess of the senate, a vacancy occurs in any such office, the governor shall appoint some fit person to discharge the duties thereof until the next meeting of the senate, when he shall nominate some person to fill such office. * * *."

The offices in question were not created by the constitution, but by statute; neither does the constitution provide how such offices shall be filled when created; consequently, the legislature possessed plenary power to provide for the manner of making the original appointments, and how vacancies should be filled. *People v. Osborne,* 7 Colo. 605. The vital question, then, is, are the appointments of respondents by the governor to take effect before confirmation by the senate, lawful? Respondents are the original appointees.

The section of the constitution under consideration, and which controls the authority of the governor in this respect, inhibits such appointments, if by the section of the act providing for the appointment of the judges of the court of appeals their appointment, to become effective, can only be made in a specified manner. From this section we find that it specifies the qualifications of the judges, and that not more than three of them shall belong to the same political party. It then provides:

"Upon the taking effect of this act the governor shall, with the advice and consent of the senate, appoint said judges to serve during the existence of said court,

designating one of them as presiding judge, but no such appointment shall take effect until a confirmation thereof by the senate, except that in case of vacancy through death, resignation or removal from office, the governor shall fill the same until the next session of the legislature, when the senate may confirm or reject the appointment so made. Said judges shall enter upon the duties of their office immediately upon their appointment. Vacancies shall be filled in the same manner as the regular appointments are required to be made."

This is all there is in the act relating to appointments of judges.

The cardinal rule to be followed in construing a statute is to ascertain the intent of the legislature in passing it, and to this end it is to be given a construction which will render it effective and accomplish the purpose of the legislative intent if such intent can be ascertained and reasonably inferred by permitted legal means. This is the first fundamental and paramount canon to be observed in construing a statute. Subsidiary rules may be invoked to ascertain the intent of an act if the words employed to express that intent present an ambiguity; but it is wholly unnecessary, as well as improper, to resort to them if the intent is clearly expressed by the act itself. Turning to the act we find it clearly expressed, that when the act takes effect the governor, with the advice and consent of the senate, shall appoint the judges to serve during the existence of the court. This clearly refers to the initial or original appointments, but the act further provides, in unmistakable terms, that these appointments shall not take effect until confirmed by the senate. Then follows an exception, which provides that in case of vacancy through death, resignation or removal from office, the governor shall fill such vacancy until the next session

of the general assembly, when the senate may reject or confirm such appointment. This unquestionably refers to vacancies occasioned by the death, resignation or removal of the lawful appointees. This exception serves to demonstrate (if any demonstration whatever is necessary) the intent of the legislature to draw a line clearly marking the difference between the authority of the governor to make the initial appointments, and those resulting from vacancies. This provision regarding vacancies was eminently proper, its purpose being not to permit vacancies to continue after the initial appointments, when lawfully made, until the general assembly should convene.

The final clause relating to vacancies requires that they shall be filled in the same manner as the original appointments are required to be made. This does not affect the question under consideration. By that provision it was intended that in filling vacancies the governor should be controlled by the requirements with respect to qualifications, and that not more than three incumbents should belong to the same political party. It is so clear that the expressed intent of the legislature, from the language of the act, that the original appointments should not be effective until confirmed by the senate, that it is only necessary to refer to the section itself in order to reach this conclusion. On this subject it speaks for itself. Argument can not make it any more clear than it is by the language employed. In brief, my conclusion is, that as respondents are the original appointees, their appointment must be confirmed by the senate before they can act as judges of the court of appeals.

The majority opinion, upholding the validity of the appointment of respondent is based upon two proposi-

tions, which will be considered inversely to the order they are treated in that opinion.

It is there stated, in effect, that to give the act a construction which would require the appointment of respondents to be submitted to the senate for confirmation, and that they must be confirmed by that body before authorized to discharge the duties and functions of judges of the court of appeals, would place the general assembly in the absurd position of creating a court to relieve the congested condition of the docket of the supreme court, but which new court could not enter upon the duties for which it was created for a period of at least fifteen months or until the next meeting of the general assembly. The desirability of bringing about a certain result is no excuse for shrinking from the duty of upholding the will of the legislature, lawfully expressed. The argument is *ab inconvenienti,* but wholly untenable. It is the duty of both the executive and judicial departments to obey the lawful mandates of the legislature, whatever the result may be. If, however, the argument *ab inconvenienti* is entitled to any consideration, it might well be said that the interest of the bar, litigants, and the people, will be best subserved by the appointment of judges upon the organization of the court who, by reason of their confirmation, could serve during the existence of the court. It was a new court, created with extensive powers and jurisdiction, and it was entirely within the constitutional authority of the legislature to provide that the senate should have a voice in making the original appointments of the judges of that tribunal. As a matter of fact, however, the supposed result is purely imaginary. Section 9 of article IV of the constitution empowers the governor to convene the senate in extraordinary session for executive business. Executive business embraces the con-

firmation of appointments by the governor. Convening the senate will entail expense to the state, of course, but that is no excuse for this court giving the act a construction which does not require that body to convene and confirm the appointment of respondents, unless such a construction is justified. The general assembly is responsible for whatever expense, inconvenience or delay may grow out of an extraordinary session of the senate, not the executive or this court.

The majority opinion upholds the validity of the appointment of respondents upon the ground that the act made no provision for filling vacancies in a newly created office during the recess of the senate, and that, therefore, the governor, by virtue of the provisions of section 6 of article IV of the constitution was authorized to appoint respondents to discharge the duties of judges until the next meeting of the senate. This conclusion is based upon a wrong premise. By specifying the vacancies which the governor was authorized to fill during the recess of the senate, all others are excluded. Its purpose in making this specification was to prevent a hiatus in the personnel of a body previously lawfully organized. "Vacancy" is a relative term. It may apply to a newly created office which has never been filled, or to a vacancy caused by the death, resignation or removal of an encumbent. Under the provisions of the section of the constitution invoked the governor is only authorized to appoint officials to offices created by statute whose appointment is not otherwise provided for, and during the recess of the senate may fill a vacancy occurring in any such office. It stands admitted that the authority of the governor to make appointments is controlled by the act to the extent it prescribes how the appointments shall be made. Turning to the act, it will be found that the first

authority conferred upon the governor to make appoint-
ments is that which he is authorized to make when the
act takes effect.    These are the identical appointments
now under consideration, and which have never been sub-
mitted to the senate for confirmation, but which the act
in express terms says shall not take effect until confirma-
tion by that body.   So that it is evident, from the undis-
puted facts, that by the appointment of respondents the
governor was not filling a vacancy resulting from the
death or resignation of an incumbent, neither was he fill-
ing a vacancy caused by a newly created office never hav-
ing been filled, which, by the constitution, he would be
authorized to fill during the recess of the senate, if not
otherwise provided for; for, by the very terms of the
constitution, the latter appointments can only be made in
the manner the act provides, namely, that they can only
become effective, by the section of the act under consider-
ation, when confirmed by the senate.   The majority opin-
ion seeks, however, to avoid this conclusion; on the
authority of *People v. Rucker*, 5 Colo. 455, but which is
in no sense a parallel case.

   In that case the court had under consideration an act
creating a criminal court for the county of Lake. It pro-
vided that the governor, with the advice and consent of
the senate, should appoint the incumbent for the newly
created office, but that a vacancy occurring during the
recess of the senate should be filled by the governor. The
general assembly adjourned without an appointment hav-
ing been made, and it was held that a vacancy existed
which could then be filled in the manner provided by the
constitution.

   Mark the distinction between the provisions of the
two acts.   In the Rucker case, the initial appointment
was to be made with the advice and consent of the sen-

ate, but if not so made, then during the recess of that body the vacancy thus created should be filled; while in the case at bar, original appointments are not to become effective until confirmed by the senate. In other words, the distinction is, that in the Rucker case provision was made for filling the office originally by appointment during the recess of the senate if not filled while that body was in session; but in the act under consideration no such provision was made. On the contrary, it expressly provides that original appointments can only be made with the advice and consent of the senate, and that the only vacancy which the governor is authorized to fill during the recess of that body are those arising from death, resignation or removal from office of incumbents. It is only necessary to refer to the two acts to demonstrate that the decision in the Rucker case is in no sense authority for the conclusion that the governor, by the appointment of respondents was filling a vacancy in a newly created office which he was authorized to fill during the recess of the senate. When rightly understood and applied, the Rucker case is against the conclusion of the majority, for, in principle, at least, it sustains my views.

Had the court of appeals act, instead of providing that vacancies resulting from specified causes might be filled by appointment during the recess of the senate, said that *all* vacancies should be filled during that period by the governor, there would be some ground for the conclusion announced by the majority, that the appointment of respondents was valid. It is only by making the section read that *all* vacancies occurring during the recess of the senate, however occasioned, may be filled by the governor during that period, that the conclusion of the majority can be upheld. This, I most respectfully submit, does as much violence to the section as though it

were held that the governor need not submit any appointment to the senate for confirmation. It is true that the courts have often been compelled to depart from the literal meaning of the language employed in a legislative enactment. This, however, is never permissible except to give that effect to an act necessary to carry out its intent. To do otherwise is judicial legislation, which is universally and properly condemned. It is not uncommon for lawyers, as well as laymen, to criticise opinions of courts of review where, in construing a statute, in order to declare its intent, it is necessary to supply or omit words. A striking example was the criticism of the opinion of the supreme court of the United States, in the Standard Oil case, by reading into the "Sherman Act" the word "reasonable." The criticism was wholly unjustified, because it was apparent that the word "reasonable" had to be supplied in order to express the true intent of the act. In the case at bar, however, there is not the slightest excuse, in my judgment, for injecting or rejecting any word or clause, or changing its phraseology in any respect, for the reason that, from the words employed, the intent of the statute clearly appears. This being the fact, with due respect I submit that the conclusion of the majority, on the subject under consideration, can only be upheld by assuming that the English language is inadequate to express a clear legislative intent; or that, in this instance, the general assembly employed words to conceal a legislative intent, instead of to express it.