[No. 3437.]

The People of the State of Colorado ex rel. Jerome
v. The Regents of the State University.

1. State University.
The location of the state university is, by the constitution, established at Boulder, and cannot be changed except by constitutional amendment.
2. Same.
Except as limited by the constitution, the general assembly has power to alter or take away the rights and franchises of the state university.
3. Franchises.
Grants of rights and privileges by the sovereign authority to corporations are, when accepted, franchises.
4. Quo Warranto—District Attorney—Relator.
The district attorney may institute proceedings in the nature of *quo warranto* upon his own responsibility, and, if upon request he refuses so to do, a private person, as relator, may in a proper case institute them without leave of court.    After complaint filed by a private person, as relator, it is the duty of the court to determine whether he had a right to commence the proceedings or has a right further to maintain them.
5. State University.
The regents of the state university have no power to maintain the medical department of the university at any place other than at Boulder.

*Appeal from the District Court of Arapahoe County.*

Mr. A. E. Pattison, Mr. Oscar Reuter and Mr. L. W. Hoyt, for appellant.

The Attorney General (Mr. Calvin E. Reed and Mr. George H. Thorne, of counsel) Mr. W. L. Murphree,

Mr. MOSES HALLETT, Mr. HUGH BUTLER and Mr. W. H. BRYANT, for appellees.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

This is a proceeding in the nature of *quo warranto* under section 289 of the code of 1887, and is prosecuted in the name of The People of the State of Colorado on the relation of Frank Jerome, a private citizen of the state, and a resident freeholder and taxpayer of Arapahoe county. Its object is to exclude the defendant corporation (the regents of the university of Colorado) from the exercise of a franchise alleged to be unlawfully usurped by it.

The material facts are not in controversy. By section 5 of article 8 of our constitution, the state university is located *at* Boulder, and under the decision of this court *In re State Institutions*, 9 Colo. 626, its location cannot be changed except by constitutional amendment. Under section 12 of article 9 the regents of the university are constituted a body corporate to be known by the name of "The regents of the university of Colorado." To this corporation section 14 of the same article confides the general supervision of the university and exclusive control of the university funds and appropriations. Chapter 128 of Mills' Annotated Statutes (Gen. Stats. 1883, chap. 112) is but an enactment, in these particulars, of the constitutional provisions, and, of course, adds nothing thereto. By section 4595 Mills' Ann. Statutes (Gen. Stats. sec. 3449) the university shall include certain designated departments and such other departments as the board of regents may determine; but the board is not required to establish these departments (except the normal and preparatory) until such time as, in their judgment, the wants and necessities of the people require it.

Pursuant to this authority, the regents, several years prior to 1892, established at Boulder a medical department of the university, consisting of a three years' course with a full

and complete system of instruction; but, as they claim, owing to lack of clinical facilities at that town, the department was not a success. After a thorough consideration, the regents concluded that it would be best for the university to have the last two years of the medical course conducted in Denver, about thirty miles from Boulder, the constitutional seat of the university.

To this end, at a meeting of the board on April 6, 1892, the following resolution was unanimously adopted:

"Resolved, that the medical faculty may conduct their lectures in Denver for said two years" (i. e. the last two years of the course) "with the understanding that the appropriation heretofore granted to the medical department shall not, on that account, be increased; and this resolution is with the further understanding that all graduating exercises shall be held at the university proper, and that the instruction for the first year of the course shall be given at the university; that this resolution shall remain in force until satisfactory clinical advantages can be had at the university."

Acting under this vote of the board, the last two years of the medical course have since that time been conducted at Denver, and not at Boulder; and the teaching and other instruction therein have been done at Denver, without increased cost to the university. The graduating exercises are held, the degrees conferred, the business office kept, and the entire first year's course conducted, at Boulder.

It is claimed by the relator that such resolution of the board, and its subsequent conduct in giving effect thereto, were unauthorized and constituted an usurpation by the board of a franchise which it did not lawfully possess.

Upon the foregoing facts being presented to the district court of Arapahoe county, it dismissed the proceedings at the cost of the relator, and he thereupon brought the case by appeal to this court.

The main questions in the case are: Does the manner of teaching medicine in Denver practically amount to the conducting of a medical department of the university at Den-

ver, and the removal thereof from Boulder, and, if so, do the right and power (undoubtedly existing) of establishing a medical department at Boulder include or imply the authority to teach medicine at Denver as an incident of the former power? Two preliminary questions are urged upon us by the appellee: *first*, the relator has no right to institute or prosecute this proceeding; *second*, this court has no jurisdiction to entertain this appeal. These propositions are considered in their inverse order.

1. Confessedly, unless the determination of a constitutional question is necessary to the decision of the controversy, or a franchise is involved, jurisdiction does not attach. Possibly, the two grounds might be considered together, but the former may be left until the main question in the case is reached.

The appellee strenuously contends that there is no such question as a franchise in the case, and cites a large number of authorities in support of its position. Some of these authorities are not in point, because they relate merely to the acts of public officers, engaged as agents of the government, and acting as individuals, in the conduct of state affairs. Under the constitutional provision already cited, the regents of the university of Colorado are expressly made a body corporate. It is true that defendant is a public, and not a private, corporation, and that its rights and franchises are not vested in the sense that they may not be altered or altogether taken away by the general assembly, except in so far as limited by the constitution, yet its various functions of administration affecting the public are franchises conferred by the constitution and the general assembly, just as much as though the corporation was a private one, and are franchises in the same sense (subject to alteration) that the various functions of a private corporation are franchises. The right of the defendant to be a corporation is a franchise; and while the grant in the one case to a private corporation is attended with the incident of inviolability by the state, if the grant includes a contract, and in the other case of a pub-

lic corporation no such results follow;—nevertheless, the rights and privileges conferred in both cases are grants by the sovereign authority, and when accepted and exercised by a corporation, public or private, are franchises.   While it is also true that many, if not most, of the things which the defendant corporation may do in and about the supervision of the university may be done by private individuals with respect to private schools or colleges conducted by them,— and if done by the latter are not franchises,—yet when done by the defendant in its public corporate capacity, are franchises.   4 Thompson on Corporations, §§ 5335, 5383 ; *Regents v. McConnell*, 5 Neb. 423 ; *Regents, etc., v. Board of Education*, 4 Mich. 212 ; *The People v. Trustees of Geneva College*, 5 Wend. 211 ; *State ex rel. v. Regents of the University*, 55 Kan. 389.

2. We have been favored with an elaborate treatise upon some of the phases of the law of *quo warranto*, and a long list of authorities is called to our attention to the points that this relator cannot file an information without leave of court, and that he has not shown sufficient interest to maintain the proceeding.   We appreciate the diligence and learning of counsel in these particulars, but, in our view, much of the discussion is not relevant.   Counsel concede that under the provisions of our code leave of court is not required at all when the district attorney acts upon his own responsibility. If, upon request, he refuses to act, a private person, as relator, may in a proper case institute the proceeding without obtaining leave of court in the first instance.   But after the complaint is filed, the court may then determine, and it is its duty to determine, whether the private relator has the right to institute the proceeding at all, or the right further to maintain it.

In the case at bar, the facts are that the district court permitted the relator to file his complaint; at least, we must assume that such permission was given from its conduct of the case.   No objection was made by the defendant in any form, either by motion, demurrer, or answer, to the right of

the relator either to bring, or prosecute, the proceeding. Upon the contrary, it filed its answer, and upon the issues of fact thus joined, the court proceeded to a hearing of evidence, of both parties, and decided the cause upon its merits. This conduct of the defendant operates as a waiver—so far as a party may waive such a question—of the objection it now makes for the first time upon appeal to the right of the relator to bring and maintain this proceeding.

While it may be true that in this state the general doctrine is established (*People ex rel. v. Grand River Bridge Co.*, 13 Colo. 11) that a purely private person may not, as a matter of right, prosecute an information under our code to correct wrongs done to the public, but is confined to cases where the injury peculiarly affects him; yet the authorities seem to be unanimous that when once the discretion of the court in which the proceeding is brought has been exercised, and permission given to relator to file an information, such discretion is exhausted, and may not be recalled; but on the contrary, the court must then proceed to determine the controversy, the same as any other, upon the law and the facts. High on Extraordinary Remedies, § 806.

But under our practice, whatever the general rule may be in other cases, where the unlawful assumption of a franchise is charged against the regents of the university, there is manifest propriety, if not necessity, in holding that a proceeding to correct the wrong should be in the control of a private party, subject to the supervisory power of the court. For by sec. 4610 Mills' Ann. Stats. (Gen. Stats. sec. 3464) the attorney general is made the legal adviser of the board of regents, and it is his duty to institute, prosecute and defend all suits in its behalf; and though, under our code (sec. 289) the district attorney, and not the attorney general (*A., T. & S. F. R. R. Co.* v. *The People*, 5 Colo. 60), is the proper officer to institute proceedings in *quo warranto* in the inferior courts, and he may also under section 1551, Mills' Ann. Stats. (Gen. Stats. sec. 1056) follow the case into the supreme court;— still, whenever the cause reaches the supreme court, the attor-

ney general, under sec. 1783, Mills' Ann. Stats. (Gen. Stats. sec. 1344), would at once be entitled, from that time, to control its further progress. Unless, therefore, the proceeding may be maintained by a private party, it will be readily seen that there might be a miscarriage of justice, for if the attorney general, with the inconsistent duties imposed by law upon him of representing both parties to the controversy, should conclude to act in the double capacity, or for any reason conclude that the regent should not be disturbed, there would be no practical way of correcting the wrong, however flagrant might be the conduct of which the regents were guilty.

3. Coming now to the principal question, we do not find much difficulty in its determination. Counsel for appellee with plausibility argue that the question is not so much one of power as of expediency, and that in all questions of administration the regents are given a discretion, with which a private person may not interfere, and over which the courts have no control.

In many, if not in most, of the great universities, the policy is to concentrate at one central seat every part of all their departments. Whether, in the case at bar, the regents have acted wisely and for the best interests of the university and of the public, is not a matter for our consideration. As we regard it, the question before us is whether, under the constitution and statutes of this state, the regents have the power, or the franchise, to teach medicine, or conduct the medical school of the university, at any place outside of Boulder.

While the resolution hereinbefore set out contemplates the teaching for the last two years of the course at Denver as a temporary expedient, and only until suitable hospital and clinical facilities are furnished at Boulder, the record abundantly discloses that no such facilities exist there now, or are likely ever to exist, so as to call for a change from this so-called temporary arrangement. That the conducting of the last two years of the course in Denver is practically a removal of the medical department from Boulder, scarcely

admits of a reasonable doubt. The first year's course is still pursued at Boulder, but the instruction there given is chiefly such as might be imparted in the other departments of the university. Indeed, provision is made whereby, upon certain conditions, one may receive a degree without ever having taken the first year's course at Boulder, so that, practically, one may be graduated from the medical department without ever having been present at the university at Boulder, except possibly upon commencement day to receive his diploma, and even this is not a positive requirement. The defendant, therefore, having substantially removed the medical department to Denver, the question recurs, has it the power so to do? So far as we are advised, there is no precedent exactly in point;—that is, where such an attempt was made by a public corporation, or by the managing board of a state educational institution.

In the case of *The People ex rel. Regents v. The Auditor General*, 17 Mich. 161, the legislature had provided for the payment of a tax to the regents of the university, upon condition that they carried into effect a prior law of the state providing that there should always be at least one professor of homeopathy in the department of medicine. The regents claimed to have complied with this provision by adopting resolutions organizing in the department of medicine a school called the Michigan School of Homeopathy which, however, was to be located at some suitable place, to be selected by the regents, other than Ann Arbor, which was the seat of the university and where the medical department of the university had previously been organized and still existed.

In a proceeding by mandamus brought by the regents to compel the auditor general to pay the tax, the supreme court held that, considering the legislation of that state, it was fairly within the contemplation of the legislature in providing for this tax that the new professorship should be established at the same place, viz : at Ann Arbor, where the university and the medical department were located. There-

fore the regents, not having complied with the conditions imposed by the donor of the tax, were not entitled to the gift.

The precise question here raised was not there decided; but in the separate opinions of three members of the court much light is thrown upon the principle which should control the decision here. Mr. Justice Campbell was in favor of granting the writ upon the broad ground that the regents had the power to locate any department of the university at any place in the state where they saw fit; while Mr. Justice Christiancy was of the opinion that the university having been located at Ann Arbor by the legislature, it was beyond the power of the regents to establish any part of any department elsewhere, without legislative permission to that effect. The reasons given in Mr. Justice Graves's opinion are to the same purport, although the writ was refused upon the ground that the regents had not complied with the condition imposed by the legislature.

The case of *The People v. Trustees of Geneva College, supra,* if the same rule applies to public as to private corporations, as we think it does, is, as to the question we are now considering, in point. Geneva college was incorporated under the laws of New York, and by its charter was located at the village of Geneva. It established a medical school in New York city, and there conducted a school of medicine; whereupon the attorney general filed an information in the nature of *quo warranto* charging that the trustees were exercising, or usurping, franchises without authority of law. In an able opinion by Chief Justice Savage it was held that the college was unlawfully usurping a franchise in the appointment of a medical faculty for the purpose of giving instruction in medicine in the city of New York. The entire opinion is interesting and instructive upon this and other branches of the case before us. Upon the principal question in the case the Chief Justice said:

" This corporation, by the very terms of its charter, is restricted as to *place*, as much so as is the Bank in Geneva.

Suppose the Bank of Geneva were to establish an office of discount and deposit in the city of New York, could they justify such a proceeding? It may be answered that the charter of this bank contains an express prohibition against carrying on business elsewhere; but without such prohibition, there would be no question on the subject, and it would be no answer to say that the bills are signed *in Geneva;* and yet the cases would be precisely parallel. The signing of the degree gives no more locality to the business of instruction, than the signing of a bank bill does to the operation of discounting a note. It is *at Geneva,* if anywhere, that the defendants have an existence and the capacity to appoint professors and give instruction, as well as to sign the diploma. Corporations take nothing by implication; certain powers are indeed incidental to the principal business to be carried on, but the instruction of youth at Geneva by no means requires or justifies the establishment of a branch in the city of New York. If one branch of the business may be carried on out of the village of Geneva, the whole may, and Geneva college may locate herself anywhere in the state; nay, in every town in the state. Such a claim would be preposterous and absurd, yet equally well founded in legal right with the claim we are now examining. * * * The information in this case is not against certain persons assuming to exercise corporate powers without authority, but against a corporation claiming the exercise of powers not conferred upon it by its charter. That the college does not possess the power claimed, seems to me most manifest."

In principle we see no distinction between that case and the one at bar. Our constitution confirms the location of the university of Colorado at Boulder, and our statute but reaffirms it. The location of the university includes all its departments and every part thereof. With the wisdom of this policy, we repeat, we are not now concerned. It is conceded to be a part of our state history that the location of the university was not "solely the result of a selection of the fittest place for such an institution, but was largely the

result of the claims made and enforced by that particular section of the state to have one of the great institutions of the state located in its midst." This has its bearing, and should have its influence, upon the interpretation to be given to the language of the constitution—if of doubtful import— but in this case the meaning is so plain and clear that it needs not the aid of contemporaneous history to interpret it.

In *In re State Institutions, supra,* this court recognized that the location of these institutions, including the university, was confirmed by the constitution. If the regents have the power to remove a part of any of the departments of the university, it follows that they have the power to remove the entire department. If they have the right to remove an entire department, they also have power to remove all, or such of the departments as they may determine. To say they have any such power would be equivalent to declaring that they might remove the entire university from Boulder, and thus override the constitution itself, and render nugatory the efforts of those by whom the location was secured. The fact that the regents keep their business office at Boulder, that commencement exercises are held there and diplomas awarded and fees received and accounts kept, is not a compliance with the mandate of the constitution that the university located *at* Boulder is the university over which they have supervisory power. To retain the shell at Boulder, while the real work of the university, or of any of its integral parts, is done elsewhere, would be an evasion of the letter and spirit of the statutes and the constitution. That instrument indeed gives to the regents the general supervision of the university, but this does not include the power to establish the university, or change its location, in whole or in part, as previously fixed by the constitution and statutes of the state. Their supervision must relate to, and be confined to, the university and all its departments, as located *at* Boulder, and not elsewhere.

The judgment of the district court, therefore, is reversed, and the cause remanded with instructions to grant the writ

prayed for by the relator excluding the defendant corporation from exercising the franchise of teaching medicine at Denver.

*Reversed.*