**SIGMA CHI FRATERNITY, a voluntary association, Sigma Chi Corporation, an Illinois corporation, Beta Mu Chapter of Sigma Chi, a voluntary association, and Beta Mu House Corporation, a Colorado corporation, Plaintiffs,**

v.

**The REGENTS OF the UNIVERSITY OF COLORADO, a corporation, Defendant.**

Civ. A. No. 9525.

United States District Court
D. Colorado.

Aug. 31, 1966.

Winner, Berge, Martin & Camfield, Fred M. Winner, Denver, Colo., for plaintiffs.

Duke W. Dunbar, Atty. Gen., of State of Colorado, Raphael J. Moses, Asst. Atty. Gen., Boulder, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

Before BREITENSTEIN, Circuit Judge, and CHILSON and DOYLE, District Judges.

DOYLE, District Judge.

This is an action in which the plaintiffs seek injunctive relief against the defendant, The Regents of the University of

Colorado, primarily based on two actions of the defendant, a resolution which was passed in 1956 and an enforcement order directed to the defendant Beta Mu Chapter of Sigma Chi issued on May 29, 1965. A third but less important claim is based on a resolution adopted by the Regents in December, 1965. It is alleged that the Regents acted contrary to the Constitution and laws of the United States in the actions which they took. The 1965 enforcement action gave immediate rise to the present court action. On that occasion the regents adopted a resolution placing the Beta Mu Chapter of Sigma Chi on probation with loss of rushing and pledging privileges "until it can fully comply with the University policy resolution of March 19, 1956." This came about following receipt by the Regents of information that Sigma Chi had suspended its Stanford University chapter purportedly as a result of the pledging by that chapter of a Negro student. The complaint further alleges that Beta Mu chapter is affiliated with the international fraternity Sigma Chi, hereinafter referred to as the "national" organization; that it is required to abide by the rules of the national fraternity; that as an affiliated chapter it may pledge any person it wishes but that the national fraternity must approve a pledge in order for him to be initiated. Beta Mu House Corporation, an association of alumni of Beta Mu chapter, owns the chapter house at Boulder, Colorado.

In addition to injunctive relief, plaintiffs seek a declaratory judgment that "the actions of defendant complained of be declared to be in excess of defendant's jurisdiction, arbitrary and capricious, unconstitutional and void and of no force or effect." It is prayed that an injunction be issued prohibiting defendant from "enforcing or attempting to enforce against plaintiff(s) * * * the resolutions and threats herein complained of."

At the request of plaintiffs a three-judge court has been convened in accordance with Title 28 U.S.C. § 2281. The case has been tried to the Court, extensive briefs have been filed and the matter now stands submitted.

The March 19, 1956 resolution is the main target of the plaintiffs. It called for the University to place on probation any fraternity, social organization or other student group compelled by its constitution, rituals or government to deny membership to any person because of his race, color or religion. Such campus organizations were required to file certificates of compliance with the resolution. Beta Mu chapter filed such a certificate of compliance.

On April 17, 1965, at a meeting of the Board of Regents, one of the members of the Board stated that after reading accounts in the newspaper concerning the suspension of the Sigma Chi chapter at Stanford University he entertained serious doubts concerning the accuracy of the certificate of compliance filed by Beta Mu chapter in purported compliance with the 1956 resolution. He offered a resolution requiring Sigma Chi to produce evidence that the Stanford suspension was not connected with the pledging of a Negro student by the Stanford chapter. The full text of the remarks and resolution as reflected by the minutes reads as follows:

"I am extremely concerned over the implications of the action of the national Sigma Chi Fraternity suspending its Stanford University chapter immediately after that chapter had pledged a Negro student. The suspension was supposedly for failure to 'carry on the ritual, standards and traditions of the fraternity.' It is to be noted that the fraternity has a clause which forbids a chapter from proposing membership for anyone 'likely to be considered personally unacceptable as a brother by any chapter or any brother anywhere.'

"By rule of many years standing the University of Colorado requires that no fraternity or sorority have any provision systematically barring membership to any person on account of race, creed or religion. All that

the University has heretofore required as evidence of nondiscrimination is a certificate from the organization involved certifying as to the lack of discriminatory provision. All fraternities and sororities have eventually filed such a certificate and the University has never looked behind it.

"It now appears that the certificate filed by Sigma Chi does not accurately reflect the situation in that fraternity. The evidence seems overwhelming that Sigma Chi does have a rule violating the nondiscrimination policy of this University. I do concede the possibility, however, that the appearance of discrimination may be without foundation. I certainly would want to know the national fraternity's explanation of this. Therefore, I move the following resolution:

"RESOLVED, That the Secretary of the Board of Regents request the national officers of Sigma Chi Fraternity to within 30 days supply to the Board of Regents a statement as to the reasons for the suspension of the Stanford University Chapter of Sigma Chi and to further supply all evidence substantiating the statement and showing that the suspension was in no way connected with the pledging of a Negro student by the Stanford chapter and that the matter be placed on the agenda for the May meeting."

The resolution was adopted unanimously. A copy of the statement and resolution was forwarded to the secretary of the national Sigma Chi organization. Notice was included that the May meeting of the Regents would be held on "the 28th of the month at 2:00 p. m., in Room 302, Regent Hall, on the University of Colorado campus in Boulder." The president of Beta Mu chapter, Charles Licka, was advised that the Board "was going to hold a meeting to decide whether Beta Mu chapter of Sigma Chi would be placed on probation." It is stipulated that "Licka, at that time, was given some material relating to the Stanford situation," and that Licka was notified "as to the time of the May meeting of the Regents."

Prior to the May meeting, an inquiry by correspondence was instituted by Don Saunders, Secretary of the Board of Regents. This correspondence was with Sigma Chi national officers, with Stanford officials, and with officers of the Stanford chapter. There was also correspondence between Beta Mu chapter and its national officers. The officers of Beta Mu were instructed to remain silent at the May meeting.

At the May meeting of the Board, held on May 29th, 1965, a resolution was adopted placing Beta Mu chapter on probation. The resolution somewhat reveals the basis of the action which was taken. The text of this resolution is as follows:

"WHEREAS, the Regents of the University of Colorado on March 19, 1956 adopted a policy resolution declaring that there shall be no distinction or classification of students at the University of Colorado made on account of race, color or religion; and, further, that after September 1, 1962, the University shall place on probation any fraternity, social organization or other student group that is compelled by its constitution, rituals or government to deny membership to any person because of race, color or religion; and

"WHEREAS, the Regents on April 17, 1965 requested that the national officers of Sigma Chi Fraternity provide within 30 days a statement of reasons for the suspension of the Stanford chapter of the Fraternity; and, further, to provide all evidence substantiating the statement and showing that the suspension was in no way connected with the pledging by the Stanford chapter of a Negro student; and

"WHEREAS, the requested materials have been provided and have been studied by the members of the Board of Regents, along with materials pro-

vided by Stanford University and by the Stanford chapter of Sigma Chi Fraternity; and the University chapter of Sigma Chi has been invited to present any information they desired but have not seen fit to do so; and

"WHEREAS, it clearly appears that the suspension of the Stanford chapter was directly connected with that chapter's announced intention to rush and pledge on a non-discriminatory basis and that the chapter's action thereby violated an unwritten tradition or practice of the national Sigma Chi Fraternity; and

"WHEREAS, the Stanford episode demonstrates that the chapters of Sigma Chi fraternity are compelled to deny membership on the basis of race, color or religion and that the certificates of non-discrimination heretofore filed are not correct;

"*NOW, THEREFORE BE IT RE-SOLVED*: that the University of Colorado chapter of Sigma Chi Fraternity is hereby placed on probation with immediate loss of the privilege of rushing and pledging and that the chapter shall remain on probation until it can fully comply with the University policy resolution of March 19, 1956."

At the May meeting of the Regents, the officers of Beta Mu chapter remained silent. As a result the information before the Board was limited to various correspondence, including letters written directly to it by the chief executive officer of the Sigma Chi Fraternity, Grand Counsel Wade. There were also several letters of Wade which had been written to others, and a considerable volume of correspondence with others directly concerned with the Stanford incident, including officers of the local chapter and officials of the University. In addition, there were numerous copies of correspondence among Sigma Chi national officials, Sigma Chi chapters, and alumni.

This material is present in the record before us. It is unnecessary to narrate this. It is sufficient to say that there had been considerable conflict between the Sigma Chi national organization and the Stanford chapter prior to the suspension. The Stanford chapter had indeed refused to observe Sigma Chi ritual; but in addition, it had for some time announced its decision to rush, pass and pledge students of minority racial groups. The Stanford chapter formally pledged a Negro student from Denver, Colorado, James Washington, on April 3, 1966. The formal action suspending the Stanford chapter took place the day before, on April 2. However, Washington had been passed by the chapter some days prior to April 3, and this fact had been communicated to the national organization. Sigma Chi apparently stood on the letters of Grand Counselor Wade, and the Board of Regents could have concluded that the statements contained in those letters were ambiguous.

We mention the above only to bring out that there was evidence before the Board of Regents which supported its action. Whether this information was of the kind and character requisite in such circumstances we must consider hereinafter.

It is stipulated that prior to the May 29, 1965, resolution, "no testimony was taken by defendant and no information was submitted to them under oath." It is further stipulated that none of the contributors of the information were present to be cross-examined and that "at least three members of the Beta Mu chapter * * * attended the May 29, 1965 meeting * * * but did not make any statement at all, although opportunity to speak was afforded those in attendance. * * *" It is also stipulated that the material submitted to the Board was discussed in executive session but was not discussed openly.

It does not appear that there was any reluctance or refusal on the part of the Board of Regents to make any of the information available to plaintiffs. The latter did not make any inquiry concerning it.

The May 29, 1965, minutes of the Board of Regents contain a statement

by one of the Regents that "the evidence provided had failed to establish that the suspension (of the Stanford chapter) was in no way connected with the pledging of a Negro student by the Stanford chapter."

On September 9, 1965, Beta Mu chapter requested the Board by letter to lift the probation, stating that henceforth Beta Mu would be autonomous in the selection of members and had so informed the national organization. This request was considered by the Regents at the September 15, 1965, meeting. President Licka and two other active members of Beta Mu were present and made statements. Licka said in answer to a question that the chapter's action had been taken because of the mutual acceptability clause of the national organization. He also referred to the national organization's action of deleting the requirement of a photograph or reference to race, religion or national descent in the pledge forms of local fraternities.

A motion to relieve Beta Mu from the probation failed to carry. The minutes reflect that the basis for the Board's decision was the failure of Beta Mu either to sever its ties with the national organization or to obtain some form of acquiescence from the national regarding its autonomy so as to insure its freedom of action.

One other action must be noted, and that is the Board's resolution of December 16, 1965, amending the 1956 resolution by making the following addition:

"After September 1, 1971, the University shall place on probation any fraternity, social organization or other student group in which a condition of membership is a recommendation by a person not a student at the University, or in which any person not a student at the University may exercise a veto over such membership."

The parties have entered into a stipulation as to the issues which are before the court as follows:

"The only issues before the court are whether the actions of the de-

fendant are constitutionally valid and whether procedural due process was afforded Sigma Chi in placing Beta Mu Chapter on probation. Whether Beta Mu Chapter is compelled by its constitution, rituals or government to deny membership to any person because of his race, color or religion is not an issue."

Other issues have arisen at the trial, including whether a three-judge court was properly convened and whether the action has become moot as a result of the decision of the Beta Mu chapter to relinquish its campus standing.

### I.

Title 28 U.S.C. § 2281 prohibits the issuance of an injunction restraining the action of a state officer in the enforcement or execution of a statute, or of an order pursuant to the statute, unless the application for injunction is heard and determined by a three-judge district court. Therefore, the initial questions here are whether a three-judge court is properly convened and whether relief is sought against state legislative action.

It would appear that the definitive Supreme Court decision on the jurisdiction of three-judge courts is Florida Lime and Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960). Involved in that case was a California statute regulating the importation of avocados. The district court dismissed the action, and on direct appeal the case was reversed. Notwithstanding that a question arose as to the adequacy of the attack upon the statute, the Supreme Court held that the case should have been determined by the three-judge court pursuant to Section 2281. The Court went on to hold that the district court erred in concluding that there was no dispute as to present legal rights but only a mere prospect of interference.

It is also established that legislative acts of state administrative agencies may constitute a "statute" within the meaning of Section 2281.

Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659 (1923); Southern Ry. Co., v. Alabama Public Service Comm., D.C.Ala.1950, 91 F.Supp. 980, reversed on other grounds, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); Eichholz v. Hargus, D.C.Mo. 1938, 23 F.Supp. 587, affirmed Eichholz v. Public Service Comm., 306 U.S. 268, 622, 59 S.Ct. 532, 83 L.Ed. 641 (1939). And see McCormick & Co. v. Brown, 4 Cir. 1931, 52 F.2d 934. The 1956 resolution of the Board of Regents must be regarded as legislative action for jurisdictional purposes. See McWood Corporation v. State Corporation Comm. of New Mexico, D.N.M.1965, 237 F.Supp. 963.

■ It can not be said that the claim of violation of a federal constitutional right is here so insubstantial as to be regarded as frivolous. See Swift & Company v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

■ The question arises as to whether the three-judge court is free to consider all of the claims in the case even in the event that plaintiffs' constitutional claim is concluded to be without merit. We are of the opinion that a three-judge court considering a case in which both constitutional and non-constitutional questions are presented in connection with an attack upon state legislative action may consider and decide the non-constitutional issues presented. See Florida Lime and Avocado Growers, Inc. v. Jacobsen, supra; Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932); Davis v. Wallace, 257 U.S. 478, 42 S.Ct. 164, 66 L.Ed. 325 (1922); Louisville & N. R. Co. v. Garrett, 231 U.S. 298, 34 S.Ct. 48, 58 L.Ed. 229 (1913).

■ Therefore, we conclude that it was proper to convene a three-judge court; and, secondly, the court having been validly convened, it is authorized to determine not only the substantive constitutional claims but also the procedural ones.

II.

The contention that this action is moot arises from the fact that Beta Mu chapter has sent a letter to the University terminating its "status of campus recognition." This letter,[1] dated May 16,

1. "The Board on Student Organizations And Social Life (SOSL) University of Colorado Boulder, Colorado Dear Board Members: As of Monday, May 16, 1966, the Beta Mu Chapter of Sigma Chi regretfully relinquishes the status of Campus Recognition that you have so cordially extended to us this past academic year. The Brothers at Sigma Chi are taking this action to insure that it can perpetuate itself in the coming years. The suit between Sigma Chi and the Board of Regents will not reach the courts until early summer. Since both parties in the suit have stated that an appeal will be made regardless of the outcome, we at Beta Mu see no immediate conclusion to the litigation. Beta Mu has been placed on probation not because of any act of our own, but because of ill-defined circumstances surrounding another Sigma Chi Chapter. We have tried in the past to limit our relations with our National organization as an appeasement to the Regents. However, this effort has failed. We have been able to sustain ourselves this past year in spite of the Regent's [sic] ruling. But, with no foreseeable conclusion to litigation, it has become appropriate and expedient to seek relief through this course of action. We are taking this action with the knowledge that the law suit will continue and that a final decision will be made concerning the legality of the Regent's [sic] ruling. The issues elected by the Regents will be determined regardless of our action. We also are taking this course of action in full knowledge that the future is uncertain. We share the understanding that, as students, we have certain responsibilities to the University; and, reciprocally, that the University has certain obligations to us as students. We sincerely hope that this matter between our National Fraternity and the Board of Regents will work out to everyone's satisfaction. We wait and hope for that day when the differences between Sigma Chi and the Regents will be resolved [sic] and we can again apply for affiliation with the University.

1966, and addressed to the appropriate student organization, states that Beta Mu's action was taken in anticipation of the delay incident to this suit and so that the fraternity could perpetuate itself "in the coming years." The letter goes on to state that Beta Mu was placed on probation "because of ill-defined circumstances surrounding another Sigma Chi chapter." It concludes with the statement that, pending the resolution of the controversy between the Regents and the national organization, "we remain loyal to Sigma Chi seeking cooperation and coordination between the parties involved not only in litigation but also in student life."

Counsel argues on behalf of the Board of Regents that Beta Mu's action in terminating its status of campus recognition renders the case moot as to all parties; that the resolution of 1956 applies only to campus-affiliated organizations, and that by its action Beta Mu has removed itself from the ambit of that resolution, and indeed from the effect of having been placed on probation. This argument is based on interpretations given by certain members of the Board of Regents in depositions. However, as plaintiffs point out, other statements of the deponents reveal that the Regents have no official policy regarding unaffiliated organizations. From this it is argued that Beta Mu and particularly its members may continue to be subject to the resolutions which are before us, or to possible further action by the Board.

 In general, an action is considered moot when it no longer presents a justiciable controversy because the issues involved have become academic or dead. Still another test is that a case is moot when a judgment, if rendered, will have no practical legal effect upon the existing controversy. See Ex Parte Steele, M.D.Ala.1908, 163 F. 694, 701. This is, however, a declaratory judgment action, and in such cases there is a

tendency to construe the mootness doctrine more narrowly. Porter v. Lee, 328 U.S. 246, 66 S.Ct. 1096, 90 L.Ed. 1199 (1946); Lehigh Coal & Nav. Co. v. Central R. of New Jersey, E.D.Pa.1940, 33 F.Supp. 362. Furthermore, in injunctive actions the fact that the particular act complained of has ceased or has been completed, does not necessarily render the issue moot. See Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Woods v. Wright, 5 Cir. 1964, 334 F.2d 369. But see Two Guys From Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961), rehearing denied 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed.2d 69 (1961). In one group of cases—those arising under the National Labor Relations Act—the cessation of an allegedly unfair labor practice is not sufficient to render an action moot. See, e. g., National Labor Relations Board v. Denver Bldg. & Const. T. C., 10 Cir. 1951, 192 F.2d 577; J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). The reasoning in these latter cases, and also in Gray v. Sanders, supra, is that a case is not moot if the practices sought to be enjoined are likely to occur again. Generally, however, the situations are ones in which the party defendants have taken some action or refrained from taking some action. Here, of course, we are considering the effect of action taken by a plaintiff whose rights form the basis of the suit.

 One fact is of utmost significance in the present determination, and that is that there does not exist a definite policy regarding the status of an unaffiliated student group. The 1956 resolution refers to "any fraternity, social organization or other student group." It makes no distinction between affiliated or unaffiliated organizations. It can not be said that the resolution is not applicable to Beta Mu in its unaf-

Until that time we remain loyal to Sigma Chi seeking cooperation and coordination

between the parties involved not only in litigation but also in student life."

filiated status. Therefore it cannot be said that the controversy is ended. The most that can be said is that the action of Beta Mu chapter has rendered the controversy somewhat obscure. This does not mean that the conflict has ended and that the matter is moot.

In view of our holding it is not necessary to consider other points which have been raised in connection with this question. We refer to the contention of plaintiffs that Beta Mu acted under coercion. We need not consider what effect, if any, this could have on the question of mootness. Nor is it necessary to consider the effect of public interest on the mootness question.

### III.

The 1956 resolution of the Regents is the center of plaintiffs' attack. They contend that this resolution, subjecting to probation any student group "compelled by its constitution, rituals or government to deny membership to any person because of his race, color or religion," constitutes an interference with a federally-protected right—the right of freedom of association—and is therefore unconstitutional. They claim that this right has received recognition as a part of the freedoms guaranteed by the First Amendment and incorporated in the due process clause of the Fourteenth Amendment as a restriction on state action such as here complained of.

The freedom of association which plaintiffs seek to uphold by invoking the Constitution is that which has been expounded by the Supreme Court in recent years in a number of cases, the most important of which are a series of decisions involving the National Association for the Advancement of Colored People. The chief of these is the decision of the Supreme Court in N. A. A. C. P. v. State of Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). This case, as well as others, equates freedom of association with the rights of freedom of speech and assembly. Plaintiffs have described their position as merely seeking the same rights which have been granted to the N. A. A. C. P. and other similar political groups.

As previously indicated, the leading case in this recent group expounding the doctrine relied on by plaintiffs is that of N. A. A. C. P. v. State of Alabama ex rel. Patterson, supra. There an Alabama court adjudged the N. A. A. C. P. guilty of contempt. This judgment followed the refusal of that organization to comply with an order of the trial court requiring it to produce and deliver lists of all of its Alabama members and agents to the Alabama Attorney General. The Supreme Court held that the original order was unconstitutional and void in that it involved a "likelihood of substantial restraint upon the exercise by petitioner's members of their right to freedom of association." 78 S.Ct. at 1172. The Court further held that the interest of the state in the lists was not a sufficient justification for the imposition of the order. The right of association as within the protection of freedom of speech and of assembly was there expounded as follows:

> "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. De Jonge v. State of Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278; Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. [Citations omitted] Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the

effect of curtailing the freedom to associate is subject to the closest scrutiny." 357 U.S. at 460, 461; 78 S.Ct. at 1171.

Thus the right there recognized as having constitutional status was freedom to associate for the purpose of advancing views or ideas.

Subsequent decisions have continued to recognize the principle announced in N. A. A. C. P. v. State of Alabama ex rel. Patterson. These include: Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); Louisiana ex rel. Gremillion v. N. A. A. C. P., 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961), and Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). These decisions were also concerned with the right of a state to compel disclosure of N. A. A. C. P. membership lists. In each instance the Supreme Court struck down the state action on the basis that it was an interference with the constitutional right of association—a part of freedom of speech and of assembly. It was held in each instance that the interests which were being advanced by the curtailment of the right asserted were not sufficiently related to the means adopted to accomplish the legislative purpose.

It is clear from an examination of these cases that the right of association is not, as plaintiffs have contended, an absolute right but is always subject to evaluation in relation to the interest which the state seeks to advance.

It is also important to note that the N. A. A. C. P. cases arose in contexts of interference with such interests as political, economic, religious, or cultural interests, although it does not appear that the right of association is necessarily limited to such objectives.

In an effort to discover whether there has been heretofore a recognition by the Supreme Court of the right of the particular character here asserted, that is in relation to a social organization having no broad public interest objectives, we have examined many of the decisions which have considered the right of association. A thorough discussion is contained in N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). There a Virginia statute sought to regulate the solicitation of legal business. An effort was made to apply it to the N. A. A. C. P. The Supreme Court held this to be unconstitutional on the ground that legal activities of that association were modes of expression, protected by the First and Fourteenth Amendments, because of the fact that there litigation constituted a means for achieving the legal objectives of equality of treatment for the members of the Negro community. The Supreme Court said:

"We need not, in order to find constitutional protection for the kind of cooperative, organizational activity disclosed by this record, whereby Negroes seek through lawful means to achieve legitimate political ends, subsume such activity under a narrow, literal conception of freedom of speech, petition or assembly. For there is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity. Thus we have affirmed the right 'to engage in association for the advancement of beliefs and ideas.' N. A. A. C. P. v. State of Alabama ex rel. Patterson, supra, 357 U.S. at 460, 78 S.Ct. at 1170. We have deemed privileged, under certain circumstances, the efforts of a union official to organize workers * * *. And we have refused to countenance compelled disclosure of a person's political associations.

\* \* \* \* \* \*

"The NAACP is not a conventional political party; but the litigation it assists, while serving to vindicate the legal rights of members of the American Negro community, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the

ideas and beliefs of our society. For such a group, association for litigation may be the most effective form of political association."

83 S.Ct. at 336, 337.

Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), dealt with a federal subversive activities control act insofar as it interfered with the right of the plaintiff in that case to travel. The regulation was held to be unduly broad and restrictive. Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), like *Button,* supra. pertained to the propriety of state action prohibiting a union from recommending lawyers to injured members, the recommendation looking to the prosecution of their claims. While recognizing the right of the state to regulate the professional conduct of lawyers, it was held that the regulation there challenged constituted an unconstitutional interference with the right of the members of the union to associate together to help one another preserve and enforce rights granted under federal laws.

Most recently, in Elfbrandt .v. Russel, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966), a state statute requiring oaths of allegiance from public employees, was held to be too broad and to bear no logical relationship to the purpose of preventing furtherance of aims of subversive organizations.

It can not be said that any of the above decisions uphold the right of association as applied to a social fraternity. Of course, the lack of an exact or closely analogous precedent will not defeat plaintiffs' claims if the claims have substantial merit. It is finally, therefore, a matter of viewing the alleged violation in relationship to the authority of the Regents, the objects sought to be advanced and the method used to achieve their objectives.

It is also plain that the right asserted is not an absolute one but must be measured in relationship to the surrounding facts. It will be helpful to reexamine the contentions so as to place them in better perspective. As to the plaintiffs, it would be an exaggeration to say that they are seeking the recognition of the right to discriminate if they choose to do so on the basis of race or creed, and to be able to do it with impunity. A more apt description of the plaintiffs' contention is in terms of their seeking recognition of a right of association which grants to them freedom to select members free of state regulation. They contend that this right is of such a nature that any official interference, and particularly the present resolution, amounts to constitutional infringement. The Regents, on the other hand, are not forcing plaintiffs to take members who belong to any particular group. The extent and degree of the attempted regulation would be more accurately described as an effort to eliminate from the charters and rituals of the organizations affected a provision which *compels* discrimination on the basis of race, color or creed.

Turning now to the background facts that we consider important to this decision, we point out first the admitted conclusion that the Board of Regents has broad powers to regulate the affairs of the University of Colorado. Constitution of Colorado, Article IX, sections 12 to 14; 1963 C.R.S. 124–2–10. Counsel for defendants maintain that the Regents stand in a paternal relationship toward social organizations on the campus. While we need not adopt this characterization, it is clear nevertheless that the University, and the Regents as its governing board, can validly impose a wide variety of regulations.

A university, in the promotion of its educational objectives, has in some instances abolished fraternities altogether and such legislation has been upheld by the courts. Waugh v. Board of Trustees, 237 U.S. 589, 35 S.Ct. 720, 59 L.Ed. 1131; Webb v. State University of New York, N.D.N.Y.1954, 125 F.

Supp. 910. In *Waugh,* supra, a statute was passed *prohibiting* the existence of Greek letter fraternities and similar societies in the state's educational institutions. The statute also deprived members (persons who joined) of the right to receive or compete for diplomas, class honors, prizes, or medals. It required existing members of Greek letter fraternities to renounce allegiance to and affiliation with such fraternities. This statute was upheld against the contention that it constituted a denial of due process, equal protection and privileges and immunities of citizens. The Supreme Court, in recognizing the peculiar power of the state over educational institutions, said in part:

"It is said that the fraternity to which complainant belongs is a moral and of itself a disciplinary force. This need not be denied. But whether such membership makes against discipline was for the state of Mississippi to determine. It is to be remembered that the University was established by the state, and is under the control of the state, and the enactment of the statute may have been induced by the opinion that membership in the prohibited societies divided the attention of the students, and distracted from that singleness of purpose which the state desired to exist in its public educational institutions. It is not for us to entertain conjectures in opposition to the views of the state, and annul its regulations upon disputable considerations of their wisdom or necessity * * *."

Again, in *Webb,* supra, the District Court for the Northern District of New York, through Judge Augustus Hand, upheld a New York statute outlawing altogether the college fraternity. Here the Court said:

" * * * However, we find little merit in the numerous contentions made by the plaintiffs as it is clear that the constitutionality of the action taken here cannot be questioned. A state may adopt such measures, including the outlawing of certain social organizations, as it deems necessary to its duty of supervision and control of its educational institutions * * *."

Another factor which cannot be overlooked is that the interest which the Board of Regents was advancing in passing the 1956 resolution was not an inherently invalid interest. Indeed, the Supreme Court of the United States has in recent years recognized the importance of elimination of racial discrimination in educational institutions. See Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and McLaurin v. Oklahoma State Regents for Higher Ed., 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950). It can be said that the policy which the Regents were promoting constituted implementation of the substantive rights guaranteed by the Fourteenth Amendment.

Finally, the resolution itself is, as compared with that approved in *Waugh,* supra, a mild regulatory measure. It seeks to promote the principle of racial and religious equality, but there is nothing in it that can be regarded as an excessive exercise of power.

Therefore, we need not base our decision on the proposition that the right of association as recognized by the cases is not a right which has had prior recognition. Instead, we hold that if the right exists it is a relative one. Thus the plaintiffs can not insist on immunity from state regulation. We further hold that the particular relationship before us renders the plaintiffs susceptible to regulation of the kind here questioned. We further conclude that the purpose of the resolution is valid and clearly within the powers of the Board. Thus plaintiffs' contention that the resolution of 1956 violates their constitutional right is without merit and must be rejected.

IV.

In support of their contention that the *May, 1965,* resolution of the Board of Regents placing Beta Mu chapter of

Sigma Chi on probation violated their right to procedural due process, plaintiffs assert that they were not given adequate notice, were not given a proper hearing and, thirdly, that the decision placing the chapter on probation was not based on sufficient evidence.

■ The test as to whether a party has been afforded procedural due process is one of "fundamental fairness" in the light of the total circumstances. It has been said that the due process clause of the Fifth Amendment does not guarantee any particular mode of procedure but that it does require adequate notice of opposing claims, reasonable opportunity to prepare and meet them in an orderly hearing adapted to the nature of the case and finally, a fair and impartial decision. See Brotherhood of Railroad Trainmen v. Chicago, M., St. Paul R. R. Co., D.D.C.1964, 237 F.Supp. 405, 418.

■ The requirements of notice and of a fair and impartial hearing mean that the parties must be given a fair opportunity to present their positions. Local 130, International Union of Electrical, Radio and Machine Workers, A.F.L.-C.I.O. v. McCulloch, D.C.App. 1965, 345 F.2d 90.

In the case at bar notice of the time and place of the Board's hearing, together with notice of the nature of the issues to be considered, was afforded to plaintiffs. Representatives of both the local and the national fraternity were notified and, as previously noted, representatives of the Beta Mu chapter were present.

■ Plaintiffs maintain, however, that the May 29 meeting did not comply with the statutory requirements of the State of Colorado applicable to administrative hearings. 1963 C.R.S. 3–16–1 et seq. Plaintiffs also say that they had no opportunity to cross-examine witnesses and that they did not examine the information that was considered by the Board, and finally that there was in fact no basis from the evidence for the conclusion reached by the Board.

The Colorado Administrative Procedures Act applies to "rule making and licensing procedures by state agencies." Throughout this code the reference is to agencies. It does not expressly apply to the University, and inasmuch as that body is neither a rule-making nor a licensing agency of the state, the statute cannot be said to apply by implication to it. The University is a somewhat unique institution. The Board of Regents is created by the Colorado constitution and has general supervisory powers of the affairs of the University of Colorado. It has been recognized as a body politic which is distinct from the executive branch of the government. Cf. People ex rel. Jerome v. Regents of the State University, 24 Colo. 175, 49 P. 286 (1897); In re Macky's Estate, 46 Colo. 79, 102 P. 1075, 23 L.R.A.,N.S., 1207 (1909).

But even if we were to hold that the administrative code applies, it would not follow that there had been a violation of procedural due process. Thus the question is whether the plaintiffs received substantial fairness from the Board under the circumstances and in the light of the applicable federal constitutional tests.

■ As to the right to cross-examine, it is to be noted that the plaintiffs did not demand this. Instead, they were content to submit letters and to send the local Beta Mu representatives as observers. They did not avail themselves of the opportunity to make a showing. If the Board of Regents, in conducting a hearing with respect to one of its agencies, were required to conduct something in the nature of a court hearing there might be some merit to the plaintiffs' argument; however, this is not the law. See Finfer v. Caplin, 2 Cir. 1965, 344 F.2d 38. The Regents must have a degree of latitude in determining the course and scope of the proceedings to be taken. The important question is whether the plaintiffs were given an opportunity to be heard. We must conclude from an examination of the record that such an opportunity was

afforded. Plaintiffs elected not to offer evidence other than the explanatory letters sent by Grand Counsel Wade. In truth the plaintiffs desired to stand on the substantive legal question which has been here presented and which has been resolved against them.

The claim that the Board of Regents acted without evidence is also lacking in merit. From the material offered and the reasonable inferences to be drawn from it there was evidence from which the Board could conclude that the certificate of compliance filed by Beta Mu chapter pursuant to the 1956 resolution did not accurately reflect the true situation within the Sigma Chi Fraternity.

Therefore, the claim of deprivation of due process of law is without foundation. The Regents acted in compliance with their rules and regulations which were available to the parties. The procedures employed afforded the plaintiffs ample opportunity to discover and consider the merits of the case in advance of the hearing. We do not say that these proceedings were conducted in the best manner possible. There could indeed be improvement in the method used by the Board of Regents. It does not follow from this observation, however, that there has been a violation of procedural due process. We hold that this contention is without merit.

We have also considered plaintiffs' contention that the resolution of the Board of Regents passed in December, 1965, which prohibited a provision for recommendation by a non-university student as a prerequisite to membership in a fraternity, constitutes a violation of equal protection of the laws under the Fourteenth Amendment. Plaintiffs argue that this resolution treats them differently from other social fraternities in that the latter are given to 1971 to eliminate national veto provisions. We conclude that we need not consider this. We note that that resolution was passed subsequent to the filing of the complaint in this action. The actions here complained of arise entirely with respect to the 1956 resolution. Moreover, we see no equal protection problem with respect to this December, 1965 resolution. The resolution deals with a *different* problem and treats all student groups in precisely the same manner; no valid equal protection objection could be lodged against it.

In conclusion we must note that we are mindful of the "in the middle" plight of the Beta Mu chapter. However, we are powerless to remedy this. Our function is to consider the constitutional validity of the action taken. We have found that it is valid. The fact that the Regents could possibly have proceeded with more diplomacy or skill in solving this problem is not a matter for our consideration.

For the reasons stated, it is

Ordered that judgment be entered in favor of the defendant and against the plaintiffs; and it is

Further directed that counsel for the defendant submit a formal judgment to the Court in accordance with the Federal Rules of Civil Procedure.