Dr. Lee Kerschner Executive Director Department of Higher Education Colorado Commission on Higher Education 1550 Lincoln Street, 2d Floor Denver, CO 80203
Dr. Richard R. Bond President University of Northern Colorado Greeley, CO 80639
Gentlemen:
This opinion is in response to a letter dated November 9, 1979 from Dr. Kerschner and two letters from Dr. Bond dated November 13, 1979 and November 15, 1979, all of which inquire about the legal status of degree programs offered by the University of Northern Colorado outside the State of Colorado.
QUESTION PRESENTED AND CONCLUSION
Your request for an attorney general's opinion presents the following question:
Whether the University of Northern Colorado ("UNC" or the "university") has the authority to operate programs outside Colorado for which a UNC degree is awarded.
 My conclusion is "no." In my opinion, article VIII, section 5 of the Colorado Constitution and the statutes establishing UNC, as construed by the courts, do not permit UNC to operate programs, other than class excursions, outside Colorado.
ANALYSIS
By virtue of amendments to article VIII, section 5 of the Colorado Constitution, adopted in 1972, the University of Northern Colorado is a constitutionally recognized body of the State of Colorado. Subsection (1) of that constitutional provision states:
 The following educational institutions are declared to be state institutions of higher education: The university at Boulder, Colorado Springs, and Denver; the university at Fort Collins; the school of mines at Golden; and such other institutions of higher education as now exist or may hereafter be established by law if they are designated by law as state institutions. The establishment, management, and abolition of the state institutions shall be subject to the control of the state, under the provisions of the constitution and such laws and regulations as the general assembly may provide; except that the regents of the university at Boulder, Colorado Springs, and Denver may, whenever in their judgment the needs of that institution demand such action, establish, maintain, and conduct all or any part of the schools of medicine, dentistry, nursing, and pharmacy of the university, together with hospitals and supporting facilities and programs related to health, at Denver; and further, that nothing in this section shall be construed to prevent state educational institutions from giving temporary lecture courses in any part of the state, or conducting class excursions for the purpose of investigation and study; and provided further, that subject to prior approval by the general assembly, nothing in this section shall be construed to prevent the state institutions of higher education from hereafter establishing, maintaining, and conducting or discontinuing centers, medical centers, or branches of such institutions in any part of the state.
In analyzing the question raised by your request for opinion, the second sentence of this constitutional provision is of critical importance. That sentence initially sets forth a general principle, namely that state institutions of higher education are to be controlled by the state "under the provisions of the constitution and such laws and regulations as the general assembly may provide." Four exceptions to the general rule are established — a) the regents of the University of Colorado are granted constitutional permission to operate certain programs in Denver; b) schools may give "temporary lecture classes in any part of the state"; c) schools may conduct class excursions; and d) with the approval of the legislature, schools may maintain "centers, medical centers, or branches of such institutions in any part of the state."
The history of article VIII, section 5 is particularly instructive. The original wording in article VIII, section 5 was somewhat different in that, as relevant here, none of the exceptions contained in the second sentence existed, and the section included language stating that the locations of the then named institutions were "confirmed." Two early Colorado cases construed this constitutional provision to mean that the location of the named institutions could not be changed except by constitutional amendment. In re Senate Resolution,9 Colo. 626, 21 P. 472 (1886); People ex rel. Jeromev. Regents, 24 Colo. 175, 49 P. 286 (1897). Both cases involved the University of Colorado, whose location was specified to be "at Boulder" by the constitution. In Jerome, the issue was whether the regents had authority to operate a portion of the medical training program in Denver. The court held that the regents did not have such power, stating:
 If the regents have the power to remove a part of any of the departments of the university, it follows that they have the power to remove the entire department. If they have the right to remove an entire department, they also have power to remove all, or such of the departments as they may determine. To say they have any such power would be equivalent to declaring that they might remove the entire university from Boulder, and thus override the constitution itself, and render nugatory the efforts of those by whom the location was secured. The fact that the regents keep their business office at Boulder, that commencement exercises are held there and diplomas awarded and fees received and accounts kept, is not a compliance with the mandate of the constitution that the university located at Boulder is the university over which they have supervisory power. To retain the shell at Boulder, while the real work of the university, or of any of its integral parts, is done elsewhere, would be an evasion of the letter and spirit of the statutes and the constitution. That instrument indeed gives to the regents the general supervision of the university, but this does not include the power to establish the university, or change its location, in whole or in part, as previously fixed by the constitution and statutes of the state. Their supervision must relate to, and be confined to, the university and all its departments, as located at Boulder, and not elsewhere.
24 Colo. at 185 (emphasis added).
In 1910, article VIII, section 5 was amended. The language regarding confirmation of location was retained, but two provisions relating to location were added:
 And, provided further, That the regents of the university may, whenever in their judgment the needs of the institution demand such action, establish, maintain and conduct all but the first two years of the departments of medicine, dentistry and pharmacy, of the university, at Denver; And, provided further, That nothing in this section shall be construed to prevent state educational institutions from giving temporary lecture courses, commonly called "University extension work," and "Farmers institute and short courses," in any part of the state, or conducting class excursions for the purpose of investigation and study.
Except for minor amendments in 1922, this language remained unchanged until 1972, when the present language was adopted.
It is a well-established practice in Colorado to consider relevant information about the historical background of an enactment in the course of making decisions about how it is to be construed and applied. Industrial Commission v. Milka,159 Colo. 114, 410 P.2d 181 (1966); People ex relGriffith v. Scott, 52 Colo. 59, 120 P. 126 (1911). Reports of standing committees are a particularly good source for determining the intent of the legislature when they set forth the committee's grounds for recommending the passage of a proposed bill. Cass v. Dameron, 125 Colo. 477, 244 P.2d 1082
(1952); United States v. Five Gambling Services,346 U.S. 441 (1953). In this case, the 1972 amendments to article VIII, section 5 were contained in a referred bill from the general assembly and were known as amendment 4 on the 1972 ballot. The bill was extensively debated in the general assembly.
The recommendation for the 1972 constitutional amendment was proposed by the Legislative Council of the general assembly. In a report to the legislature entitled Organization of StateGovernment (Research Pub. No. 179, 1971), the council stated that its recommendations were "guided by the principle that the General Assembly should have the distinct prerogative to determine, through statutory means, the location, functions and powers of schools . . ." Id. at p. 5 (emphasis added). According to the ballot analysis prepared by the Legislative Council for voters, the effect of the addition of the proviso regarding "centers, medical centers or branches" was "to approve the conduct of additional educationalprograms in new locations throughout the state by presently established colleges and universities." AnAnalysis of 1972 Ballot Proposals (Research Pub. No. 185, 1972) at p. 8 (emphasis added). Thus, rather than completely overriding the locational restrictions imposed by theJerome case, the 1972 amendments to article VIII, section 5 appear to have been intended to vest locational decisions in the legislature, with four constitutionally specified exceptions.
The propriety of the UNC out-of-state programs must be considered against this legal background. Although the Colorado Constitution does not fix the location of UNC, the general assembly has placed a geographical limitation on operations of the university. The location of UNC, as established in C.R.S. 1973, 23-40-101, is to be "at or near the city of Greeley, in the county of Weld and state of Colorado." Thus, in exercising its constitutionally mandated control over the university, the legislature has declared that UNC shall be located at or near Greeley. This statute places UNC in a legal position similar to that occupied by the University of Colorado at the time theJerome case was decided. The statutes of the state, as opposed to the constitutional language construed inJerome, have fixed the location of the university at a particular place within the state. Under the holding ofJerome, as applied to the present constitutional and statutory provisions, UNC cannot conduct all or part of its educational activities outside Colorado.
It can be argued that the holding of the Jerome case is not as broad as the language quoted on p. 6-7 of this opinion indicates. In one portion of the opinion, the court characterized the issue before it as a determination of whether the manner of teaching medicine in Denver amounted to conducting a department of the university at Denver, and the removal of that department from Boulder. 24 Colo. at 177-78. However, in other portions of the opinion the court stated that "the question before us is whether, under the constitution and statutes of this state, the regents have the power . . . to teach medicine . . . at any place outside of Boulder," and that the "location of the university includes all its departments and every part thereof."24 Colo. at 181. Absent any indication of constitutional or legislative overruling of the Jerome case, the analysis of Jerome is applicable to the issue addressed in this opinion. The legislature has established the location of UNC at or near Greeley, and Jerome holds that such language is to be construed strictly.
Article VIII, section 5 does appear to authorize temporary lecture courses "in any part of the state" and, with the approval of the general assembly, centers or branches "in any part of the state." The first proviso limits and the second proviso elaborates the principle that the legislature is to control the "establishment, management and abolition" of state institutions of higher education. In general, provisos are to be strictly construed, and only those subjects specifically exempted by the proviso should be freed from operation of the basic provision.New York Indemnity Co. v. IndustrialCommission, 86 Colo. 364, 281 P. 740 (1929); see
2A Sutherland, Statutory Construction, section 47.08 (4th ed. 1972). The constitutional provision does not place a geographical limitation on class excursions.
Dr. Bond has inquired whether any state law prohibits out-of-state course offerings by state institutions of higher education. I am aware of no such statute. However, an agency of the state may exercise only those powers which are specifically granted to it or necessarily implied by the constitution or statutes.Garvey v. Freeman, 397 F.2d 600 (10th Cir. 1968);Flavell v. Dept. of Welfare, 144 Colo. 203, 355 P.2d 941
(1960). It does not appear, particularly in light of theJerome case, that authorization for UNC to offer courses outside Colorado can fairly be implied from the existing constitutional and statutory provisions. Absent such authorization, the university is prohibited from establishing programs in other states.
The question has been raised whether C.R.S. 1973, 23-40-104(1)(a) authorizes UNC to conduct out-of-state programs. C.R.S. 1973,23-40-104(1)(a) authorizes the board of trustees of UNC to "do all things lawfully appertaining to said university in like manner as municipal corporations." Colorado cases have held that municipalities are permitted to furnish certain services beyond their corporate limits, provided that such activities benefit the city. City of Pueblo v. Flanders, 122 Colo. 571,225 P.2d 832 (1950) (fire protection); Board of Commissioners ofFt. Collins, 68 Colo. 364, 189 P. 929 (1920) (water). However, these cases are inapposite to UNC. First, UNC is not a municipality; it is an agency of the state with quasi-municipal powers. These cases do not decide whether cities (or state agencies) may operate outside state boundaries. In addition, the rationale of necessity applied in cases of fire protection, police protection and water supplies may not apply to educational services offered outside the state. Second, and most important, there is substantial difference of opinion on the question of whether or not the UNC out-of-state programs benefit the State of Colorado and its citizens. Both advocates and critics of the program are able to marshall considerable arguments in favor of and against the proposition that the program benefits either UNC or the state. SeeReport to University of Northern Colorado by BlueRibbon Panel, pp. 62-65 (February 1980). Finally, the powers of municipal corporations are to be strictly construed and no powers are to be exercised except those expressly conferred or necessarily implied. City of Central v. Axton,150 Colo. 414, 373 P.2d 300 (1962). If doubt exists as to a municipality's power, that doubt must be resolved against the municipality. City of Aurora v. Bogue, 176 Colo. 198,489 P.2d 1295 (1971). Considering the constitutional language regarding temporary lectures and branches "in any part of the state," the precedent of the Jerome case, and the questions regarding benefits to the state, it is my opinion that a court probably would find that the university does not have implied authority to offer courses outside Colorado.
I am informed that UNC operates a "junior year abroad" program in Florence, Italy, for undergraduate students regularly enrolled at Greeley. It appears to me that this program is properly categorized as a "class excursion" under article VIII, section 5, and therefore is not prohibited by the constitution or the statutes. Most students who attend the program start at and return to the Greeley campus. Unlike the CSAP programs, the Florence program does not offer courses to persons who have no other significant ties to the Greeley campus. The Florence program supplements the Greeley curriculum, rather than supplanting it as do the UNC out-of-state programs.
This opinion does not address the question of whether or not the legislature could authorize temporary lecture courses or centers or branches of Colorado institutions conducted beyond the borders of Colorado. Even if the constitution permits such legislation, there is no legislation authorizing the out-of-state programs which UNC currently operates.
SUMMARY
In summary, it is my opinion that the present laws of Colorado do not permit UNC to operate programs outside Colorado. I am aware that this conclusion conflicts with some contemporary views regarding the delivery of educational services. However, appropriate legal authorization is needed before out-of-state programs may be operated by Colorado institutions of higher education.
Very truly yours
 J.D. MacFARLANE Attorney General
EDUCATION, HIGHER EDUCATIONAL INSTITUTIONS STATUTORY CONSTRUCTION
C.R.S. 1973, 23-40-101
C.R.S. 1973, 23-40-104
Colo. Const. art. VIII, § 5
HIGHER EDUCATION, DEPT. OF Comm. on Higher Education
Present Colorado law does not permit operation of programs outside Colorado by Colorado institutions of higher education. A "junior year abroad" program may be characterized as a class excursion under article VIII, section 5.